# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-KA-01158-SCT

*LESTER LAVON PARKER, JR. a/k/a LESTER*
*LEVON PARKER, JR. a/k/a LESTER PARKER, JR.*
*a/k/a LESTER LAVON PARKER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/20/2011 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | ALEXANDER C. MARTIN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART, VACATED IN PART AND REMANDED - 06/06/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Fifteen-year-old Lester Lavon Parker Jr. was convicted in the Circuit Court of Copiah County, Mississippi, for the murder of his fifty-three-year-old grandfather, James Shelton. He was sentenced to serve the remainder of his "natural life" in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Parker challenges his conviction and sentence.

FACTS

¶2. In January 2002, James and Doris Shelton, Parker's grandparents, became his guardians. Carl Roberts, a family friend of the Sheltons, testified that they had a "[g]ood" relationship with Parker, provided him with a "Christian home[,]" and that Parker "was very fortunate to have as many people as he had in his life." On October 23, 2010, Doris was killed in a tragic car accident, following which, James was awarded custody of Parker.

¶3. On January 23, 2011, at approximately 2:00 p.m., Parker went to Roberts's home to pick up two of Roberts's sons, who were to go hunting on James's property along with Parker and James.[1] Roberts testified that when Parker arrived, he "seemed to be the [person] we've always known."[2] At around 6:30 p.m., Parker dropped off Roberts's sons at their home and returned to his grandfather's home. According to Roberts, "about 30 minutes later, [Parker] come back . . . upset, and Taylor, my son, come got me. . . . [W]hen he returned, [Parker] said somebody shot my Paw Paw. . . . [Parker] stayed and at that time I headed toward [James's] home." While en route, Roberts called 911. With the 911 dispatcher on the line, Roberts entered the home, "and it was known that [James] was passed away, and . . . I exited the house and waited on the officer." According to Roberts, his "first impression" was that James had committed suicide.

---

[1] According to Roberts, Parker "grew up in my house[,]" as his children were friends with Parker.

[2] Regarding Doris's death, Roberts testified that "sure, [Parker] was saddened by that . . . , but . . . [t]he kid I seen that day in my house was the kid I've always known prior to that afternoon."

¶4.    At 7:40 p.m., Deputy Jeremy Thornton of the Copiah County Sheriff's Department arrived at the Shelton home. After Deputy Thornton observed the "gunshot wound to [James's] head[,]" he requested an investigator from the sheriff's department. Thereafter, Investigator Chad Sills went to the Robertses' home to talk with Parker, whom he viewed only as a witness, not a suspect. According to Investigator Sills, Parker "told me that it was an accident, he had shot [James] at the house is what [Parker] said." Investigator Sills then brought Parker to the sheriff's department for a formal statement. According to Investigator Sills, Parker gave four different versions regarding the incident. Investigator Sills testified that:

> [t]he first version was he stated that he went to drop the [Roberts] boys off at their house, come back to . . . [James's] house, went into his room and got his shotgun, went into the bedroom and got another shotgun, pointed one shotgun to his head . . . and pointed one at [James] and pulled the triggers. There was only one gun that had a shotgun shell in it he said, but he pulled both triggers and the one that had the shotgun shell was in the gun that was pointed at [James].

According to Investigator Sills, the second version:

> is he said he thought the gun was on safe. He went to his room and got the gun and pointed it at [James] and thought it was on safe, pulled the trigger and it wasn't on safe and it went off and shot [James] in the back of the head.

Regarding the third version, Investigator Sills testified that:

> [Parker] was upset at [James] and at his father because he . . . was having to live there and he didn't want to live there anymore,[3] so he went and got the shotgun and was just going to point it at him just to prove a point. He wasn't meaning to pull the trigger or shoot at [James], he just wanted to point the gun at [James].

---

[3]According to Investigator Sills, Parker "said that he had a problem living there because . . . [Doris] had passed away and [it] brought up memories."

3

According to Investigator Sills, in the fourth version, Parker stated that:

> his father was going to take his truck, his phone and send him to Chamberlain Hunt[4] if he decided to not live at [James's] residence anymore. . . . [A]nd he said he could not live there anymore, so he shot [James]. He thought that was the only way he was going to . . . be able to move away from there.

¶5. On March 15, 2011, Parker was indicted for "wilfully, unlawfully, feloniously, of his malice aforethought and without the authority of law, kill[ing] and murder[ing] [James], . . . contrary to and in violation of [Mississippi Code] Section 97-3-19 . . . ." On July 20, 2011, the jury trial commenced. During the State's case-in-chief, photographs of the victim were admitted over Parker's objection. *See* ¶10 *infra* (discussing the photographs, objections, rulings, etc.). Following the State's case-in-chief, Parker moved for a directed verdict, which was denied by the circuit court. Parker, then sixteen years old, testified on his own behalf. According to Parker, when he informed James and his father[5] that he wished to live with his mother, they "decided that if I moved, that he would send me to Chamberlain Hunt and take all my stuff away." According to Parker, this "[p]issed me off." Parker testified that, upon leaving the Robertses' home, he already had made up his mind to return home and shoot James.[6] According to Parker, he shot James when "I saw the corner of his eye look at me."

---

[4]Chamberlain-Hunt Academy is a "Christian Military Boarding School" located in Port Gibson, Mississippi. *See* Chamberlain-Hunt Academy, www.chamberlain-hunt.com/ (last visited May 16, 2013).

[5]According to Parker, his contact with his father was infrequent.

[6]Similarly, Investigator Sills testified that, "I asked him, 'Did you leave the Robertses' residence to go back to your grandfather's house and kill your grandfather?' And he said yes."

The jury found Parker guilty of murder, and the circuit court sentenced him to "natural life" in the custody of the MDOC.

¶6.     Following the circuit court's denial of Parker's "Motion to Set Aside Sentences and Motion for Judgment of Acquittal Notwithstanding the Verdict of the Jury" and "Motion for a New Trial," Parker filed a notice of appeal.

## ISSUES

¶7.     This Court will consider:

(1) Whether the circuit court abused its discretion by allowing the introduction of photographs of the victim.
(2) Whether Parker's murder conviction was against the overwhelming weight of the evidence.
(3) Whether Parker's sentence of life imprisonment violates the Eighth Amendment's ban on cruel and unusual punishment in light of the recent United States Supreme Court holding in *Miller v. Alabama*.

## ANALYSIS

### I.      Whether the circuit court abused its discretion by allowing the introduction of photographs of the victim.

¶8.     This Court has stated that:

[a]dmission of photographs by the trial court is reviewed for abuse of discretion. *Dampier v. State*, 973 So. 2d 221, 230 (Miss. 2008). A decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion. *Id*. The discretion of the trial judge is "almost unlimited . . . regardless of the gruesomeness, repetitiveness, and the extenuation of

5

probative value."[7] *Id*. (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)).

*Chamberlin v. State*, 989 So. 2d 320, 340 (Miss. 2008).

¶9.    "[P]hotographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." *McFee v. State*, 511 So. 2d 130, 134-35 (Miss. 1987) (citations omitted).  But "[s]o long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory."  *Chamberlin*, 989 So. 2d at 340 (quoting *Dampier*, 973 So. 2d at 230).  Regarding probative value, "[o]nly *some* . . . is needed to support a judge's admission of a gruesome photograph."  *King*, 83 So. 3d at 378 (citing *Chamberlin*, 989 So. 2d at 340) (emphasis in original).  As to "meaningful evidentiary purpose," that requirement is satisfied when the photograph "(1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony."  *Chamberlin*, 989 So. 2d at 340 (citing *Dampier*, 973 So. 2d at 230).  *See also King*, 83 So. 3d at 378; *Barfield v. State*, 22 So. 3d 1175, 1181 (Miss. 2009); *Bennett v. State*, 933 So. 2d 930, 946 (Miss. 2006).  In sum, "[t]he question as to each photograph is whether it: (1) had probative value and (2) aided in

---

[7]As this Court recently stated, it "has found photographs 'to be so gruesome and inflammatory as to be prejudicial in only one circumstance, a close-up photograph of a partly decomposed, maggot-infested skull.'" *King v. State*, 83 So. 3d 376, 379 (Miss. 2012) (quoting *Holly v. State*, 671 So. 2d 32, 41 (Miss. 1996)). *But see Welch v. State*, 566 So. 2d 680, 685 (Miss. 1990) (autopsy photographs of dissected victim were unpleasant and were used in a way that was overly prejudicial).

describ[ing] the circumstances of the killing, described the location of the body and cause of death, or supplemented or clarified witness testimony." ***Chamberlin***, 989 So. 2d at 341.

¶10.    During the direct examination of Melissa Claire Nethery, a "crime scene analyst" with the Mississippi Bureau of Investigation, the State sought to introduce crime-scene photographs (Exhibits S-9 through S-14).  As to Exhibit S-9, which the State referred to as "a picture of the crime scene[,]" counsel for Parker objected that:

> [t]hey have a Power Point . . . that they've described where all of the items are which better displays to the jury where she found these items rather than presenting a picture of the deceased.  If the [S]tate wants to show where the items are collected, they did a better job with the diagram than this photograph . . . .  I think this is unnecessary.

The circuit judge overruled Parker's objection, concluding that "it's prejudicial, but *I can see the probative value* of it[,]" and Exhibit S-9 was admitted into evidence.  (Emphasis added.) Regarding Exhibits S-10 through S-14, which the State provided "sho[w] the entrance and exit wound[,]"[8] counsel for Parker objected that the photographs were "cumulative."  The circuit judge concluded that "I find there are issues in the case that those photographs help in explaining. . . .  I'll overrule your objection."  Exhibits S-10 through S-14 were then admitted into evidence.

¶11.    Parker argues that "[t]he only issue for the jury to determine was Parker's state of mind at the time of the shooting, specifically, whether he acted in the heat of passion.  The

---

[8]Nethery stated that Exhibit S-10 "is a view as you first enter into the residence[;]" Exhibit S-11 "depicts a view of the victim and a partial view of the foyer area[;]" Exhibit S-12 "is a close-up view of the victim's wound to his head[;]" Exhibit S-13 "is another view of the back of the victim's head, just at a different angle[;]" and Exhibit S-14 "is a side-view of the right side of the victim, and it depicts him as he was when I arrived at the scene."

photographs presented to the jury acted to inflame the passions of the jury and were unnecessary." The State responds that the circuit court "did not abuse its considerable discretion" in admitting the subject photographs, as they "have evidentiary value since they: (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; and (3) supplement or clarify witness testimony." According to the State, multiple witnesses:

> stated that their initial reaction to the death of [James] was that he had committed suicide. This required proof that the gunshot wound to the head could not have been self-inflicted. Further, Parker's story changed numerous times during the aftermath and the investigation of the case . . . . The State simply could not rely on Parker['s] testimony, after the State rested its case, to prove its case that Parker shot [James] with malice aforethought and not in self-defense or by mistake. While Parker did admit that he killed [James] and that he had the intent of doing so before he left the [Robertses'] house the last time, the State was required to prove that Parker murdered [James] with malice aforethought in its own case-in-chief.

The State further adds that "the evidence . . . was so strong that Parker's conviction of murder was inevitable and the admission of these . . . photographs did not prejudice Parker unduly."

¶12. Exhibit S-9 provided a general picture of the crime scene which both "described the location of the body" and "supplemented or clarified" the testimony of Nethery. *Chamberlin*, 989 So. 2d at 341. *See also* **McFee**, 511 So. 2d at 135 ("this Court has consistently allowed photographic evidence to support the testimony of witnesses . . . who described the scene upon their respective arrivals."). This constitutes "some" form of probative value, such that the circuit judge did not abuse his discretion in admitting this photograph. **King**, 83 So. 3d at 378. Exhibits S-10 through S-14 were specific photographs

8

of the gunshot wound suffered by James, with Exhibits S-12 through S-14 being particularly graphic. Yet these photographs undeniably "described the location of the body" and "supplemented or clarified" Nethery's testimony. *Chamberlin*, 989 So. 2d at 341. *See also King*, 83 So. 2d at 378 ("These photographs were used to supplement the officers' testimony and the testimony of Stanton. We find that Exhibit 3e served an evidentiary purpose and was properly admitted by the trial court."). This satisfies the requirement of "some" probative value, such that the circuit judge did not abuse his "almost unlimited" discretion in admitting these photographs. *King*, 83 So. 3d at 378; *Chamberlin*, 989 So. 2d at 340. Because this Court cannot conclude that the circuit court abused its discretion in allowing these photographs to be admitted into evidence, this issue is without merit.

**II.     Whether Parker's murder conviction was against the overwhelming weight of the evidence.**

¶13.    This Court has stated that it:

> reviews a trial court's denial of a motion for a new trial under an abuse-of-discretion standard. . . . "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005). Further, when there is a motion for a new trial, "the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id*.

*King*, 83 So. 3d at 379. In our review, all evidence is "weighed in the light most favorable to the verdict." *Barfield*, 22 So. 3d at 1187 (quoting *Jones v. State*, 904 So. 2d 149, 154 (Miss. 2005)).

9

¶14. Jury Instruction S-1A provided, in pertinent part, that:

every intentional killing of a human being without authority of law and not in reasonable self-defense, is either [m]urder or [m]anslaughter; [m]urder when done with malice aforethought, and/or with a deliberate design to effect the death of the person killed[9] and [m]anslaughter when done without malice aforethought in the heat of passion[10] and not in reasonable self-defense.[11]

. . .

[T]he chief distinction between murder and manslaughter is the presence of deliberation and malice in murder and its absence in manslaughter.

¶15. Parker contends that, "[d]espite [my] admission that [I] made [my] mind up before going home," the evidence presented "portrayed a scene of nothing more than a killing in the heat of passion." According to Parker, his "emotions and passions" regarding the recent deaths of loved ones, coupled with frustration over James's objection to his moving in with his mother, "built up over time," and he "acted before [he] thought." The State responds that:

---

[9]Section 97-3-19(1)(a) provides, in pertinent part, that "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases: (a) When done with deliberate design to effect the death of the person killed, or of any human being . . . ." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2006).

[10]Jury Instruction D-7 provided that "'heat of passion' can be violent and uncontrolled rage caused by provocations by the victim toward the Defendant, and passion and anger suddenly aroused at the time by some immediate and reasonable provocation either by words or acts." *See Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996) (quoting *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990)) (defining "heat of passion" as "a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.").

[11]Mississippi Code Section 97-3-35 defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2006).

> Parker admitted that he drove back to the house to kill [James]. He admitted that he went back to his bedroom, got a gun and loaded it, went to the living room to shoot [James], and shot and killed [James] when [James] "caught him in the corner of his eye." Parker then . . . returned to the [Robertses'] house . . . . Parker testified that he shot [James] because this was the only way he could get what he wanted, that is, to go live with his mother.

According to the State, "[a]ny conflicts that arose in the testimony regarding whether Parker acted with malice aforethought or in the heat of passion, were for the jury to resolve."

¶16. There is a serious question whether the alleged provocation was "immediate and reasonable" enough to be "legally sufficient" to implicate "heat of passion" manslaughter. *Neal v. State*, 805 So. 2d 520, 525 (Miss. 2002); *Tait*, 669 So. 2d at 89 (quoting *Buchanan*, 567 So. 2d at 197). Assuming *arguendo* the existence of an "immediate and reasonable" provocation, the issues regarding "heat of passion" and "immediacy, i.e., whether a sufficient 'cooling off' period has passed between the provocation and the killing so as to negate that the crime occurred in the heat of passion, are *questions of fact*[,]" to be resolved by the jury "based upon the specific facts of the case and the conditions or temperament of the defendant." *Nolan v. State*, 61 So. 3d 887, 894 (Miss. 2011); *Tait*, 669 So. 2d at 89 (quoting *Buchanan*, 567 So. 2d at 197); *Haley v. State*, 123 Miss. 87, 85 So. 129, 131-32 (1920) (emphasis added). Here, the jury heard testimony from Roberts that, on the afternoon of January 23, 2011, Parker acted like "the kid I've always known prior to that . . . ." The jury also heard Parker's own testimony that, upon leaving the Robertses' home, he already had decided to go home and shoot James. Viewing the evidence "in the light most favorable to the verdict[,]" this Court cannot conclude that Parker's murder conviction is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an

11

unconscionable injustice." ***King***, 83 So. 3d at 379; ***Barfield***, 22 So. 3d at 1187. As this is

not an "exceptional cas[e] in which the evidence preponderates heavily against the verdict[,]"

this Court concludes that the circuit court did not abuse its discretion in denying Parker's

"Motion for a New Trial." ***King***, 83 So. 3d at 379. Accordingly, this issue is without merit.

  **III.**  **Whether Parker's sentence of life imprisonment violates the Eighth Amendment's ban on cruel and unusual punishment in light of the recent United States Supreme Court holding in *Miller v. Alabama*.**

¶17. "The standard of review this Court employs for Constitutional issues is de novo."

***Deeds v. State***, 27 So. 3d 1135, 1141 (Miss. 2009) (citing ***Thoms v. Thoms***, 928 So. 2d 852,

855) (Miss. 2006)).

¶18. On June 25, 2012, the United States Supreme Court handed down its decision in

***Miller v. Alabama***, __ U.S. __, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). ***Miller*** involved

"two 14-year-old offenders" who were "convicted of murder and sentenced to life

imprisonment *without the possibility of parole*."[12] ***Id***. at 2460 (emphasis added). The Court

emphasized that "children are Constitutionally different from adults for purposes of

sentencing," and expressed its concern that mandatory life-without-parole sentences required

"each juvenile die in prison even if a judge or jury would have thought that his youth and its

attendant characteristics . . . made a lesser sentence (for example, life *with* the possibility of

parole) more appropriate." ***Miller***, 132 S. Ct. at 2460, 2464 (emphasis in original). Relying

---

[12]The two juvenile offenders (Miller and Jackson) were convicted of capital murder for separate crimes in different states. Miller was convicted in Alabama, while Jackson was convicted in Arkansas. Both Alabama and Arkansas statutorily mandated the minimum sentence of *life without parole* for capital murder. *See* Ark. Code Ann. § 5-4-104(b) (Rev. 2006); *see also* Ala. Code §§ 13A-5-40(9), 13A-6-2(c) (Rev. 2006).

12

on its seminal cases involving sentences for juveniles, the Court held "that the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without the possibility of parole for juvenile offenders.'" *Id*. at 2469 (emphasis added); *see Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (banning capital punishment for all juveniles under age eighteen); *see also Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (holding life without parole violates the Eighth Amendment when imposed on juveniles in nonhomicide cases).

¶19.    *Miller* does not prohibit sentences of life without parole for juvenile offenders. Rather, it "require[s] [the sentencing authority] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 132 S. Ct. 2469. The *Miller* Court identified several factors that must be considered by the sentencing authority:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures  may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. *See*, *e.g.*, *Graham*, 560 U. S. [48], 130 S. Ct. at 2032 ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J. D. B. v.  North Carolina*, 564 U. S. ___, 131 S. Ct. 2394, 3400, 180 L. Ed. 2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id*. at 2468.

¶20.  Because *Miller* was decided after Parker's conviction, sentence, and notice of appeal, this Court first considers whether *Miller* applies. Prior to *Miller*, our trial courts were not required to hold an individualized sentencing hearing for juveniles before imposing a life sentence. Thus, *Miller* created a new rule with which this State must comport. The Supreme Court has stated, "[w]hen a decision of this Court results in a 'new rule,' that rule applies to all criminal cases still pending on direct review." *Schriro v. Summerlin*, 542 U.S. 328, 351, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987)). As Parker is pending on direct review, *Miller* applies.

¶21.  Parker was fifteen at the time of his conviction for murder. He was sentenced under Mississippi Code Section 97-3-21, which states, in pertinent part, "[e]very person who shall be convicted of murder shall be sentenced by the court to *imprisonment for life* in the State Penitentiary." Miss. Code Ann. § 97-3-21 (Rev. 2006). His sentencing order reads, in pertinent part, "the defendant is sentenced to serve the rest of his natural life in prison in the custody of the [MDOC]." At first blush, Parker's sentence might seem distinguishable from *Miller* because Section 97-3-21 neither mandates, nor makes any provision allowing for, a sentence of "life without the possibility of parole." *Compare supra* n.12. Parker was not sentenced by the trial court to life without the possibility of parole. Our courts have not been empowered by the Legislature to sentence a criminal defendant to life without parole save for the crime of capital murder and for certain habitual offenders.[13]

---

[13]*See* Miss. Code Ann. §§ 99-19-81, 83 (Rev. 2007).

14

¶22.   Despite the fact that murder does not carry a *specific* sentence of life without parole, our analysis is not over. Parker argues that a plain reading of the parole statute, Mississippi Code Section 47-7-3, renders his life sentence "tantamount to life without parole." Section 47-7-3(1) provides, in pertinent part, "[e]very prisoner who has been convicted of any offense . . . and is confined in the execution of a judgment for such conviction in the Mississippi Department of Corrections . . . for the term of his or her natural life . . . [and] has served not less than ten (10) years of such life sentence, may be released on parole . . . ." Miss. Code Ann. § 47-7-3(1) (Rev. 2011). However, subsection (h) reads, "[n]o person shall be eligible for parole who is convicted except that an offender convicted of only nonviolent crimes . . . 'nonviolent crimes' means a felony other than homicide . . . ." Miss. Code Ann. § 47-7-3(1)(h) (Rev. 2011). Thus, if Section 47-7-3(1)(h) is enforced, as it presently reads, Parker will not be eligible for parole. The legislative mandates, when read together, are tantamount to life without parole and fail to consider Parker's youth. We are constrained to address the present statutory scheme as it contravenes the dictates of *Miller*.[14]

¶23.   Although Parker would not be eligible for parole under Section 47-7-3(1)(h), the State argues that he is not entirely foreclosed from seeking release from prison.[15] Parker was not

---

[14]Parker submits that, in light of *Miller*, "Section 47-7-3(1)(h) is unconstitutional as applied to juveniles." This Court has stated that it "will strike down a statute on constitutional grounds only where it appears beyond all reasonable doubt that such statute violates the Constitution." *State v. Jones*, 726 So. 2d 572, 573 (Miss. 1998) (quoting *Wells v. Panola County Bd. of Educ.*, 645 So. 2d 883, 888 (Miss.1994). Contrary to Parker's argument, Section 47-7-3(1)(h) can constitutionally be applied to juveniles provided that the sentencing authority considers the *Miller* factors in sentencing. *Miller* does not require this Court declare Section 47-7-3(1)(h) *per se* unconstitutional as applied to juveniles.

[15]Mississippi Code Section 47-5-139 provides for conditional release based on earned time allowance, and states, in pertinent part,

15

sentenced to life for capital murder. Thus, he could be eligible, assuming all other requirements are satisfied, to seek "conditional release" at the age of sixty-five. Consequently, he is not mandated to spend the rest of his life in prison. *See Miller*, 132 S. Ct. at 2469 ("'A state is not required to guarantee eventual freedom,' but must provide '*some meaningful opportunity to obtain release* based on demonstrated maturity and rehabilitation.'") (quoting *Graham*, 560 U.S. 48, 130 S. Ct. at 2030) (emphasis added). However, we reject the State's argument that "conditional release" satisfies the *Miller* mandate. Conditional release is more akin to clemency, which the Supreme Court has held "[a]s a matter of law" to be different from parole "despite some surface similarities." *Solem v. Helm*, 463 U. S. 277, 300, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). Additionally, a conditional release would not be determined by the sentencing authority at the time of sentencing based on age and other characteristics, as *Miller* mandates. *See Miller*, 132 S. Ct. at 2474-75 (explaining that factors must be considered by the sentencing authority at the time of sentencing).

¶24. Mississippi is not the first state to face *Miller* issues vis-a-vis a state's parole statute. The Supreme Court of Wyoming recently addressed *Miller* in *Bear Cloud v. Wyoming*, 294 P. 3d 36, 40 (Wyo. 2013). Although *Bear Cloud* involved a juvenile convicted of capital

---

[a]n inmate shall not be eligible for the earned time allowance if: (a) [t]he inmate was sentenced to life imprisonment; but an inmate, except an inmate sentenced to life imprisonment for capital murder, who has reached the age of sixty-five (65) or older and who has served at least fifteen (15) years may petition the sentencing court for conditional release.

Miss. Code Ann. § 47-5-139 (1)(a) (Rev. 2011).

16

murder for which life with or without parole were possible sentences, a measure of illumination can be found in the Wyoming Supreme Court's analysis, as substantial similarities exist between the Wyoming and Mississippi parole statutes. Bear Cloud, a juvenile, pleaded guilty to three separate offenses, one of which was first-degree murder. Because of his ineligibility for the death penalty, Bear Cloud's two possible sentences were "life imprisonment without parole or life imprisonment according to law." *Id*. at 44. Following his plea, Bear Cloud received "life according to law." *Id*. at 39. The Wyoming parole statute provided, in pertinent part, "[t]he parole board may grant parole to any person imprisoned in any institution under sentence, except a sentence of life imprisonment without parole or a life sentence . . . ." *Id*. at 44. Bear Cloud appealed his sentence, but the Wyoming Supreme Court "held that [his sentence] was constitutional under the Eighth Amendment . . . ." *Id*. at 39. Bear Cloud then sought relief in the United States Supreme Court, which "summarily vacated the judgment . . . and remanded the case . . . for further consideration in light of *Miller* . . . ." *Id*. On remand, the Wyoming Supreme Court held that, as a result of the parole statute, "life imprisonment according to law becomes practically identical to life imprisonment without parole." *Id*. at 45. The Wyoming Supreme Court found that this outcome violated *Miller* and **remanded** Bear Cloud's sentence **to the trial court** to consider his eligibility for parole notwithstanding the present provisions of their parole statute. *Id*. at 47. The majority of this Court charts the same course today.

¶25.    Before instructing our trial courts regarding sentencing of juveniles for murder,  we are mindful that "defining crimes and prescribing punishments are exclusively legislative functions as a matter of constitutional law." *Williams v. State*, 708 So. 2d 1358, 1361 (Miss.

17

1998). "[T]he authority to say what constitutes a crime, and what punishment shall be inflicted is in its entirety a legislative question . . . ." *Id*. But, because our present statutory scheme does not meet the requirements of *Miller*, this Court is compelled by necessity to put into place a stopgap measure, seeking the minimal amount of instruction and intrusion into legislative prerogative, until such time as the Legislature can convene and ameliorate our temporary but required solution.[16]

¶26.    As previously mentioned, Parker was convicted and sentenced prior to the Court's decision in *Miller*. As such, the trial court committed no error at that time in sentencing Parker to life imprisonment, for under Section 97-3-21, it was the only sentence available. It remains the only sentence available for those who do not qualify for *Miller* considerations. Parker requests that this Court "remand . . . for a sentencing hearing with the opportunity to present mitigating evidence." We agree and vacate Parker's sentence and remand for hearing

---

[16] The Wyoming Supreme Court faced the same dilemma and eloquently established guidance to its trial courts until the Wyoming Legislature could act to modify the State's sentencing and parole scheme to comply with *Miller*. The Wyoming Supreme Court stated, "[w]e recognize that the authority to determine possible penalties for criminal offenses is vested in the Wyoming Legislature. We also readily acknowledge that it is 'axiomatic under our system of government that courts may not legislate.' *Midwest Hotel Co. v. State Bd. of Equalization*, 39 Wyo. 461, 273 P. 696, 697 (1929). While we acknowledge our role in interpreting rather than rewriting the law, we must provide guidance to the district courts that will face sentencing issues on remand in this case and in other pending cases, at least until the Legislature amends the sentencing scheme for juveniles in Wyoming to accord with *Miller* and other Eighth Amendment jurisprudence." *Bear Cloud*, 294 P. 3d at 45.

where the trial court, as the sentencing authority,[17] is required to consider the *Miller* factors[18]

before determining sentence.

¶27. The State has suggested that, if this Court should determine that *Miller* applies, then

the juvenile "would be subject to the general provisions of the parole statute which permit

parole eligibility after serving of ten years." The dissent advocates the adoption of this

suggestion. Respectfully, neither the Attorney General nor this Court should create a ten-year

minimum mandatory sentence.[19] Thus, we reject this suggested disposition. We have done

so only after extended and careful deliberation, and while maintaining our respect for the

Legislature to prescribe punishment as it sees fit, as long as the punishment (including parole

eligibility) does not violate the Eighth Amendment. Our Legislature has vested sentencing

authority solely with the trial court. The United States Supreme Court has mandated that the

sentencing authority consider the *Miller* factors before sentencing. Today's opinion

recognizes *Miller* and provides the trial court a stopgap mechanism to annul application of

Section 47-7-3(1)(h), should the trial court determine that the juvenile should be eligible for

---

[17]*See* Miss. Code Ann. § 97-3-21 (Rev. 2006) ("Every person who shall be convicted of murder *shall be sentenced by the court* to imprisonment for life . . . ."); neither this Court nor the Parole Board is vested with sentencing authority.

[18]*See supra* ¶ 19 for a discussion of applicable factors to be considered.

[19]A review of proscribed punishments for various other serious crimes reveals a wide range of sentencing discretion made available to the sentencing authority. *See* Miss. Code Ann. § 97-3-53 (Rev. 2006); Miss. Code Ann. § 97-3-65 (Rev. 2006); Miss. Code Ann. § 97-3-71 (Rev. 2006); Miss. Code Ann. § 97-3-79 (Rev. 2006); Miss. Code Ann. § 97-3-101 (Rev. 2006); Miss. Code Ann. § 97-37-23 (Rev. 2006). We choose not to intrude or speculate as to what the Legislature might select as: (1) an appropriate punishment for a minor who is found by the sentencing authority to deserve parole after *Miller* consideration; or (2) rules for parole eligibility.

19

parole after *Miller* consideration. The majority of the members of this Court agree with the *Miller* Court that this is a determination for the sentencing authority. To adopt the State's suggested disposition would be to remove the consideration from the sentencing authority, circumventing the *Miller* mandate of individualized sentencing for a minor convicted of murder.

¶28. After consideration of all circumstances required by *Miller*,[20] the trial court may sentence Parker, despite his age, to "life imprisonment."[21] *See Miller*, 132 S. Ct. at 2469 ("[W]e do not foreclose a sentencer's ability to make that judgment in homicide cases . . . ."). However, if the trial court should determine, after consideration of all circumstances set forth in *Miller*, that Parker should be eligible for parole, the court shall enter a sentence of "life imprisonment with eligibility for parole notwithstanding the present provisions of Mississippi Code Section 47-7-3(1)(h)." This allows the trial courts of this State to comport with the requirements established by the United States Supreme Court.

---

[20]"*Miller* requires . . . the sentenc[er] [to] consider the individual, the factors of youth, and the nature of the homicide in determining whether to order a sentence that includes the possibility of parole." *Bear Cloud*, 294 P. 3d at 47.

[21]This result is not inconsistent with *Fernando Martinez Parker v. State*, 30 So. 3d 1222 (Miss. 2010). In that case, upon conviction of murder, the trial court sentenced Fernando Parker to "life without parole." *Id*. at 1228. We reversed and held that the sentence exceeded the statutory maximum, regardless of what the parole statute provided. *Id*. at 1228. However, today's decision only grants the trial court the authority to sentence a juvenile to "life imprisonment" – the maximum sentence allowed by statute. Thus, today's decision in no way conflicts with *Fernando Parker*.

20

**CONCLUSION**

¶29.   We affirm Parker's conviction but vacate his sentence and remand this case to the Circuit Court of Copiah County for a hearing to determine whether he should be sentenced to "life imprisonment" or "life imprisonment with eligibility for parole notwithstanding the present provisions of Mississippi Code Section 47-7-3(1)(h)."

¶30.   **CONVICTION OF MURDER, AFFIRMED. SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, VACATED, AND THIS CASE IS REMANDED TO THE CIRCUIT COURT OF COPIAH COUNTY FOR A RESENTENCING HEARING CONSISTENT WITH THIS OPINION.**

     **WALLER, C.J., LAMAR, PIERCE AND COLEMAN, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., CHANDLER AND KING, JJ.**

     **KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶31.   I agree with the majority's holding that, in light of our probation and parole statutes, Parker's sentence was tantamount to mandatory life without parole. *Compare* Miss. Code Ann. § 97-3-21 (Rev. 2006) (only sentence for murder is "imprisonment for life") *with* Miss. Code Ann. § 47-7-3(1)(h) (Rev. 2011) (persons convicted of a violent crime are not eligible for parole).  I also agree that, because Parker was fifteen years old when the crime was committed, the mandatory sentence violates the Eighth Amendment's prohibition of "cruel and unusual punishment." ***Miller v. Alabama***, __U.S.__, 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407 (2012); U.S. Const. amend. VIII.  Respectfully, however, I disagree that compliance with ***Miller*** requires that this Court judicially modify two statutory provisions so that a juvenile convicted of murder will face the same sentencing options as a juvenile convicted

21

of capital murder. Rather than remanding the case for additional sentencing proceedings with murky guidelines, I would adopt the State's suggested remedy that we "simply hold that [Section 47-7-3(1)(h)] may not be applied to those who committed murder at a time when they were under the age of eighteen years." This approach is simple, preserves judicial resources, respects the legislative authority to prescribe the bounds of sentences, and does not encroach on the State Parole Board's statutory authority over parole matters.

¶32.    The majority constructs a new sentencing option for murder: "life imprisonment with eligibility for parole notwithstanding the present provisions of Mississippi Code Section 47-7-3(1)(h)." Maj. Op. ¶¶ 28-29. Despite the majority's insistence that this "charts the same course" as the Wyoming Supreme Court in *Bear Cloud v. Wyoming*, 294 P. 3d 36 (Wyo. 2013), it does not. *Bear Cloud* held that the least intrusive approach under *Miller* was to leave the sentencing statute undisturbed and hold the statutes which barred parole for offenders serving life sentences "unconstitutional as applied to juvenile offenders." *Bear Cloud*, 294 P. 3d at 48. The reason that Bear Cloud's case was remanded for resentencing was two-fold: (1) Bear Cloud was convicted of first-degree (capital) murder, for which life without parole is a permissible sentence; and (2) the trial court was required to determine the time period before a juvenile serving life would become parole eligible because Wyoming statutes provided no alternative. *Id.* at 47-48.

¶33.    Importantly, Parker's case is distinguishable on the same grounds that Bear Cloud's case was remanded for resentencing. Unlike Wyoming, the general provisions of Mississippi's parole statute provide a method for the determining parole eligibility when Section 47-7-3(1)(h) cannot constitutionally be applied in light of *Miller*. Miss. Code Ann.

22

§ 47-7-3(1) (Rev. 2011) (a prisoner sentenced to life must serve ten years before he or she is eligible for parole).[22]   Moreover, Parker's murder conviction, unlike a conviction for capital murder, carries one possible sentence: life.   Because the trial court already has imposed the only statutorily permissible sentence, no purpose would be served by remanding the case for resentencing.

¶34.   The majority's disposition is inconsistent with this Court's recent decision in *Fernando Martinez Parker v. State*, 30 So. 3d 1222 (Miss. 2010).   In that case, we reversed a trial court's imposition of a sentence of life without parole for murder, finding that such sentence "exceeded the statutory maximum." *Id.* at 1228.   The State argued that the sentence was legally permissible because Section 47-7-3(1)(h) foreclosed eligibility for parole.  *Id.* In rejecting this argument, we held that "Section 47-7-3 applies only to the internal operating procedures of the Department of Corrections and the prisons and does not affect a judge's sentencing prerogative under the criminal statutes." *Id.*

¶35.   The *Fernandez Parker* decision is in line with the Wyoming Supreme Court's upholding of a sentencing statute but finding the state's parole statutes unconstitutional as applied to juveniles. *Bear Cloud*, 294 P. 3d at 46.   Rather than our disturbing "the existing possible statutory sentence" for murder under Mississippi Code Section 97-3-21, finding the parole statute unconstitutional *as applied* to Parker "minimizes our intrusion into any legislative function," while preserving distinct sentences for murder and capital murder. *Id.*[23]

---

[22]Parole eligibility is an entirely different animal than a "minimum mandatory sentence."  Maj. Op. ¶27.

[23]Nothing in this opinion suggests that we should "strike down" Section 47-7-3(1)(h) as "*per se* unconstitutional."  Maj. Op. n.14.

¶36. The majority goes to great lengths to avoid the word *unconstitutional*, struggling to persuade the reader that its analysis is more restrained. Yet, calling it a "stopgap mechanism to annul application of Section 47-7-3(1)(h)" does not change the nature of the majority's holding. If Mississippi's statutory scheme "contravenes the dictates of *Miller*," as the majority finds, then our statutory scheme is necessarily unconstitutional, for there can no other reason for this Court to tamper with legislative enactments. It would be less than judicious for an appellate court to announce a holding based on a presumption that legislative action is forthcoming. Maj. Op. ¶ 25 ("[T]his Court is compelled by necessity to put into place a stopgap measure . . . until such time as the Legislature can convene and ameliorate our temporary but required solution.").[24]

¶37. As a final matter, the majority opinion addresses the retroactive application of *Miller*, but that clearly is not an issue in the present case. Maj. Op. ¶ 20. This short paragraph would establish precedent for several post-conviction cases now pending before this Court where retroactivity is a genuine issue.

---

[24]In fact, the legislature has convened since the *Miller* decision, and, effective July 1, 2013, there will be three types of murder in Mississippi: first-degree murder, second-degree murder, and capital murder. Act effective July 1, 2013, Miss. Laws WL No. 269 (S.B. 2377). Under these revisions, Parker's crime would be designated as "first-degree murder." The sentence for "first-degree murder" remains the same as the sentence for murder, but the place where the sentence is served is no longer limited to the State Penitentiary. *Id.* Notably, the parole statute was not amended, but there was an attempt to modify the subsection related to capital murder. H.B. 849, Miss. Leg. 2013 Reg. Session. The bill appeared to recognize the *Miller* holding, and would have clarified that juveniles convicted of capital murder could be eligible for parole. *Id.* The bill passed the House of Representatives, but died in committee in the Senate.

¶38.    I would affirm Parker's conviction but hold that, under *Miller*, the Eighth Amendment  to the United States Constitution prohibits the application of Section 47-7-3(1)(h) to juveniles convicted of murder.  Because the trial court already has imposed the only statutorily permissible sentence, there is no reason to disturb the sentence or remand for resentencing; thus, I respectfully concur in part and dissent in part. [25]

**DICKINSON, P.J., CHANDLER AND KING, JJ., JOIN THIS OPINION.**

---

[25]If, on remand, the trial court imposes "life imprisonment with eligibility for parole notwithstanding the present provisions of Mississippi Code Section 47-7-3(1)(h)." then "the trial court must also pronounce a specific period of time which must pass before the juvenile becomes parole eligible." *Bear Cloud*, 294 P. 3d at 48.