MANSFIELD, Justice
(concurring in part and dissenting in part).
I join in the court’s opinion to the extent it affirms the defendant’s convictions. I respectfully dissent as to the reversal of the defendant’s sentence.
To begin with, I believe the sentencing proceeding in this case complied with Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). The relevant factors relating to Null’s youth were brought to light and considered. Yet even if one were to conclude the sentencing didn’t comply with Miller, the remedy would be straightforward: a remand for the district court to apply Miller.
Unfortunately, the majority opinion goes well beyond that, providing pages of material. Yet at a critical point, the majority’s reasoning is cursory. The majority invokes the Iowa Constitution in a brief paragraph without explaining why it is doing so and whether it intends to depart from Miller This creates additional and unnecessary uncertainty as to the scope and meaning of the majority opinion.
In addition to the aforementioned concerns, I agree with my colleague Justice Zager that the district court did not abuse its discretion in imposing consecutive sentences and therefore join part II of his dissent.
I. Background.
Let us review the facts: Denem Null and two companions felt they had been slighted in a drug transaction. Null stole a handgun. Null and his companions then forced their way into an apartment, intending to rob the residents. The victim, an innocent bystander who was not a drug user or dealer, stood at the door. Null pointed the gun at him and demanded the “f-” marijuana. The victim told Null and his companions to leave. Null shot the victim twice in the head, killing him. Null then pointed the gun at the victim’s companion,- who turned her head, fearing she would be shot. At that point, however, someone in the back bedroom opened a door. Null and his companions realized there were additional persons in the apartment and decided to flee. After Null was arrested and read his rights, he stated that “he did not care that he was going to jail for life for murder.”
Null was originally charged with first-degree murder. However, a plea agreement was reached. The State added a charge of first-degree robbery; Null agreed to plead guilty to that charge and to a charge of second-degree murder; the first-degree murder charge was dismissed. Under the plea agreement, whether the murder and robbery sentences would run concurrently or consecutively was left up to the court to determine at sentencing. Null understood the State was going to *78 argue for consecutive sentences. If the sentences were concurrent, this would mean thirty-five years imprisonment before parole eligibility; consecutive sentences would mean 52.5 years.
By the time of the sentencing hearing, Null had turned eighteen. The presen-tence investigation (PSI), which the district court clearly had read and which it discussed at the sentencing, recommended concurrent sentences. In explaining this recommendation, the PSI cited the defendant’s age. The PSI also described Null’s difficult family circumstances. Yet, in addition, it quoted Null’s acknowledgment, “I had everything I needed to do right.” Following verbal presentations by the victim’s family, the prosecutor, and defense counsel, Null was given the opportunity to address the court. He told the court, “I ain’t got nothing to say.” The district court decided to make the two sentences consecutive. It gave a detailed explanation for its decision.
Our task on appeal should be straightforward. Null was sentenced before the United States Supreme Court decided Miller. Now we have the benefit of Miller. We need to determine whether Null’s existing sentence comports with Miller. If it doesn’t, then we need to remand the case for the district court to resentence in light of Miller. Unfortunately, the majority overlooks the first issue and overdoes the second.
Moreover, at the end of its opinion, the majority needlessly injects uncertainty into its ruling by detouring into Iowa constitutional law. Although the relevant precedent (Miller) is a federal constitutional case decided only one year ago, the majority proclaims that it is applying “the principles of Miller ... under the Iowa Constitution.” What this statement means is unclear. How do you “apply” a federal constitutional decision under the state constitution? I fear this strange statement will lead to confusion among lawyers and judges. Instead, we should be direct and clear about whether we are requiring something that Miller does not require.
II. Null’s Sentence Does Not Violate Miller.
I do not believe Null’s sentence violates Miller; hence, in my view, no resentencing is necessary. I will assume for the sake of argument that Null’s murder sentence and his robbery sentence should be aggregated into one sentence because they arose out of a single course of events. I will also assume for the sake of argument that a requirement to serve 52.5 years minimum before parole eligibility is a de facto life without parole (LWOP) sentence, although this is a close call. See People v. Caballero, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291, 295 (2012) (finding that a 110-year sentence amounts to de facto LWOP and focusing on whether the parole eligibility date falls outside the defendant’s natural life expectancy); People v. Rainer, -P.3d-,-, 2013 WL 1490107, at *12-14 (Colo.Ct.App.2013) (surveying the caselaw and finding that a sentence under which the defendant must serve fifty-six years before being eligible for parole at the age of seventy-five was a de facto LWOP sentence); Adams v. State, — So.3d -,-, 2012 WL 3193932, at *2 (Fla.Dist.Ct.App.2012) (concluding that a sentence of 58.5 years in prison was a de facto LWOP sentence where the defendant would not be eligible for release until he was nearly seventy-six); Floyd v. State, 87 So.3d 45, 47 (Fla.Dist.Ct.App.2012) (holding that a combined eighty-year sentence was a functional LWOP sentence where the defendant would not be eligible for parole until age eighty-five, exceeding the defendant’s life expectancy); Parker v. State, 119 So.3d 987, 997-99, 2013 WL *79 2436630, at *8-10 (Miss.2013) (finding that a life sentence where the defendant would be eligible for conditional release at age sixty-five was covered by Miller while noting that conditional release “is more akin to clemency” than parole). But see Bunch v. Smith, 685 F.3d 546, 547, 552 (6th Cir.2012) (holding that an eighty-nine-year cumulative sentence for the robbery, kidnapping, and repeated rape of one victim committed when the defendant was a juvenile did not clearly violate the prohibition on LWOP sentences of juveniles for nonhomi-cide offenses), cert. denied, 569 U.S.-, 133 S.Ct. 1996, 185 L.Ed.2d 865 (2013); Silva v. McDonald, 891 F.Supp.2d 1116, 1131 (C.D.Cal.2012) (finding that a sentence of forty years to life did not violate the Eighth Amendment, where the defendant was sixteen years old at the time of the crime and would be eligible for parole before he turned sixty); State v. Kasic, 228 Ariz. 228, 265 P.3d 410, 415 (Ct.App.2011) (concluding that Graham v. Florida does not apply to consecutive term-of-years sentences for various offenses that exceed a juvenile’s life expectancy); People v. Perez, 214 Cal.App.4th 49, 154 Cal.Rptr.3d 114, 119-21 (2013) (finding that Perez’s sentence, which made him parole eligible at age forty-seven, allowed the possibility of “meaningful life expectancy” after prison and was therefore not de facto LWOP); People v. Lucero, — P.3d-, -, 2013 WL 1459477, at *3-4 (Colo.App.2013) (holding that an aggregate eighty-four year sentence was not de facto LWOP where the defendant would be parole eligible by age fifty-seven — “well within his natural lifetime”); People v. Lehmkuhl, — P.3d-,-, 2013 WL 3584754, at *3 (Colo.App.2013) (holding that a sentence where the defendant would be eligible for parole at age sixty-seven was not the functional equivalent of life -without parole); James v. United States, 59 A.3d 1233, 1238-39 (D.C.2013) (finding that imposition of a thirty-year mandatory minimum sentence on a juvenile defendant did not violate Miller); Walle v. State, 99 So.3d 967, 972-73 (Fla.Ct.App.2012) (finding that a sentence of sixty-five years for one episode of criminal conduct was not de facto LWOP, even though defendant would have to serve eighty-five percent of this amount before being eligible for parole); Thomas v. State, 78 So.3d 644, 646 (Fla.Ct.App.2011) (“Appellant asks this Court to apply Graham to his case and find that his concurrent fifty-year sentences are the functional equivalent of life sentences.... While we agree that at some point, a term-of-years sentence may become the functional equivalent of a life sentence, we do not believe that situation has occurred in the instant case.”); Middleton v. State, 313 Ga.App. 193, 721 S.E.2d 111, 112-13 (2011) (determining that an aggregate sentence of thirty years without parole imposed on a juvenile was not unconstitutional under the United States Supreme Court’s authority), cert. denied, — U.S.-, 133 S.Ct. 867, 184 L.Ed.2d 679 (2013); State v. Brown, 118 So.3d 332, 341-42, 2013 WL 1878911, at *15-16 (La.2013) (holding that a cumulative term-of-years sentence for one criminal episode should not be treated as LWOP even though the defendant would not be eligible for parole until he was eighty-six); Angel v. Commonwealth, 281 Va. 248, 704 S.E.2d 386, 401-02 (2011) (finding that consecutive life sentences were not de facto LWOP because the defendant could petition for conditional release at age sixty).
Nevertheless, the district court had discretion whether to impose consecutive or concurrent sentences. Concurrent sentences would have made Null eligible for parole after serving thirty-five years. Thus, the outcome of 52.5 years before parole eligibility was not mandatory. Additionally, before making the sentences *80 consecutive rather than concurrent, the district court did take into account Null’s youth and its “distinctive attributes.” Miller, — U.S. at -, 132 S.Ct. at 2464-69, 183 L.Ed.2d at 418-23. Indeed, this was virtually all Null’s attorney argued at sentencing, where he urged the court to run the sentences concurrently rather than consecutively.[10]
In other words, the court did what it was supposed to do under Miller. It took into account all the mitigating evidence relating to Null’s youth, but ultimately found it was outweighed by other considerations. At sentencing, Null’s attorney argued almost all of the Miller factors, including his client’s chronological age, his lack of maturity, the absence of mentoring or a stable upbringing, and the circumstances of the offense including the extent of Null’s participation. Any Miller factors not expressly raised by Null’s counsel were clearly considered by the district court, as evidenced by its remarks at sentencing. For these reasons, I believe the sentencing here complied with Miller.
A Connecticut appellate court has reached a similar conclusion in like circumstances in State v. Riley, 140 Conn.App. 1, 58 A.3d 304 (Ct.2013), certification granted in part by 308 Conn. 910, 61 A.3d 531 (2013). The trial court there had imposed an LWOP sentence pr e-Miller, which the court of appeals sustained post-Miller:
[E]ven though the defendant declined to avail himself fully of the opportunity to present mitigating evidence related to his youth and upbringing, it is clear that the court was cognizant of these issues and searched the presentence investigation report for circumstances that might have militated against imposing a life without parole sentence.
Id. at 310. The Connecticut appellate court also declined to require sentencing courts to engage in express, on-the-record consideration of the incidents of youth. Id. at 315 (observing that “sentencing, of course, is not a science”); see also Conley v. State, 972 N.E.2d 864, 870, 880 (Ind.2012) (upholding a pr e-Miller LWOP sentence for a juvenile convicted of murder where the sentence was not mandatory and the sentencing court had considered the defendant’s youth as a mitigating factor).
In summary, and contrary to my colleagues’ suggestion, what the district court did here involved far more than “a generalized notion of taking age into consideration as a factor in sentencing.”[11]
*81 III. Even if the Sentence Violated Miller, We Should Just Remand for Resentencing in Light of Miller.
But even if we believe the sentence did not comply with Miller, there is a simple solution: We should just remand for the district court to apply Miller. This requires only a brief opinion, such as what we say in footnote 5 of our opinion this term in State v. Ragland, 836 N.W.2d 107, 113 n. 5, 2013 WL 4309970 (Iowa 2013). The district court can read Miller as well as we can.
The Wyoming Supreme Court’s decision in Bear Cloud v. State, 294 P.3d 36 (Wyo.2013), is an excellent model for a post-Miller remand. In approximately- two pages of discussion, the court there basically just quotes from Miller. Id. at 46-48. It lists seven “factors” drawn from Miller for the trial court to consider on resentencing. Id. at 47.[12] And then it tells the district court to do its job. See also Jackson v. Norris, 2013 Ark. 175, — S.W.3d -, -, 2013 WL 1773087, at *7-8 (2013) (on remand from the United States Supreme Court, severing the unconstitutional provisions from the statute and then telling the trial court simply “to hold a sentencing hearing where Jackson may present Miller evidence for consideration”); People v. Carp, 298 Mich.App. 472, 828 N.W.2d 685, 720, 723 (2012) (listing the same seven factors as in Bear Cloud and directing the district court to consider those factors at the time of sentencing); Parker, 119 So.3d at 998, 2013 WL 2436630, at *9 (vacating the defendant’s sentence and “remand[ing] for hearing where the trial court, as the sentencing authority, is required to consider the Miller factors before determining sentence” (footnotes omitted)).
The law in this case is Miller. The pages of social science and history offered by the majority do not provide additional legal standards or meaningful guidance. They are unnecessary.
If some controverted point concerning Miller comes up after resentencing, we *82 can address it then, based on briefing by the parties. Until then, we should let the district court do its work.
At the end of its opinion, the majority tries to move into the practical world and explain “what the district court is required to do” to comply with Miller. However, I find the explanation unenlightening, and I fear our district courts will as well. My colleagues repeatedly say that “the district court must recognize” certain propositions. What does this directive mean? If it means that our trial judges must take on a certain state of mind when sentencing juveniles, how is that to be enforced? We don’t usually remand cases for judges to “recognize” things.
At one point, the majority says the district court should make findings if it is not following “the general rule” that children “cannot be held to the same standard of culpability as adults in criminal sentencing.” This also strikes me as an odd statement for the court to make. A conscientious trial judge can readily accept the proposition that a juvenile like Null should not be held to the same standard of culpability as an adult. So it is unclear to me that there would ever be an occasion for such a finding. However, the standard of culpability and the sentence are two different things. Just because a juvenile is held to a lesser standard of culpability, it does not follow that a juvenile cannot receive consecutive sentences when, as here, he intentionally shoots an unarmed bystander twice in the head and kills him in the course of an armed robbery.[13]
IV. The Majority’s Decision to Apply Miller “Under” the Iowa Constitution Will Lead to Uncertainty.
Historically, when interpreting the Iowa Constitution, this court has deferred to United States Supreme Court interpretations of similarly worded provisions of the United States Constitution. See, e.g., State v. Musser, 721 N.W.2d 734, 748 n. 8 (Iowa 2006) (“Musser also challenges his sentence under the Iowa Constitution’s prohibition of ‘cruel and unusual punishment.’ Iowa Const, art. I, § 17. Because the Iowa prohibition is similar to the federal prohibition, we look to the interpretation of the federal constitution for guidance in interpreting the state provision.”).
Recently, however, we have said in various contexts that we may apply — or will apply — provisions of our constitution “more stringently” than corresponding provisions of the United States Constitution. See, e.g., State v. Kooima, 833 N.W.2d 202, 206 (Iowa 2013); State v. Oliver, 812 N.W.2d 636, 650 (Iowa 2012); State v. Pals, 805 N.W.2d 767, 772 (Iowa 2011); Bruegger, 773 N.W.2d at 883.
While I wholeheartedly agree we have the ultimate authority to interpret the Iowa Constitution, I have misgivings about these kinds of statements. We are all judges who seek to apply the law neutrally and fairly as we understand it. To say we apply the Iowa constitution “more stringently” is to import a value-laden terminology into our opinions. “Stringent” is not a term that helps one decide a particular case; it describes instead a mindset or outlook. It is like saying, “We are more protective of rights than the United States Supreme Court,” or depending on your *83 perspective, “We are more willing than the United States Supreme Court to overturn the decisions of the people’s elected representatives.”
When our court borrows from federal precedent but ultimately departs from it, we owe an obligation to be clear about the extent and nature of our departure and the analytical framework we are following. This helps trial judges and lawyers know what is expected of them in the future. “More stringent” does not fulfill that obligation.[14]
Having said that, it is one thing to make these statements when the underlying United States Supreme Court standard is a balancing test, such as whether a criminal sentence is “grossly disproportionate” to the underlying crime. See Oliver, 812 N.W.2d at 650; Bruegger, 773 N.W.2d at 883. In that case, some lack of clarity in the federal framework may justify a lack of clarity on our part. I still believe we ought to focus on explaining our decision making, and forego the use of simplistic terminology, but I can understand the court’s position.
Here, however, we do not have that excuse. Miller is not a balancing case. It involves, rather, the “confluence” of two factors — (1) a mandatory life without parole sentence that was imposed without consideration of the mitigating qualities of youth on (2) an individual who committed a crime when under the age of eighteen. See Miller, — U.S. at-, 132 S.Ct. at 2463-64, 183 L.Ed.2d at 418. So Miller sets forth a clear federal constitutional rule that we should either follow or not follow. Regardless, we should be explicit about what we are doing.
My colleagues are not explicit. Rather, they say they are applying “the principles of Miller ... under the Iowa Constitution.” I do not know what this means. The only clue can be found in the preceding citation to Bruegger, where my colleagues include a parenthetical statement that we have applied “principles espoused in Roper in a more stringent fashion under the Iowa Constitution than had been explicitly adopted by the Supreme Court under the United States Constitution.” This suggests my colleagues may be following something more than just Miller. But if so, they should say what it is, why they are taking this approach, and what in Iowa’s constitution justifies it.
To my knowledge, no other state supreme court has applied Miller in this way. Other courts have simply implemented Miller and said that is what they are doing.[15]
*84 V. Conclusion.
In sum, I believe the sentencing hearing in this case complied with Miller. But if a new sentencing hearing is necessary, we should just order it. And while we are at it, we should be forthright as to whether we are following Miller and, if not, what additional requirements we are imposing and why.
For the foregoing reasons, I respectfully concur in part and dissent in part.
WATERMAN, J., joins this concurrence in part and dissent in part.

. For example:
My client, Your Honor, at age 16 made a bad decision. And like many people that are age 16 they are not capable of making good decisions sometimes. They are unable to think about what if, what is beyond this immediate decision that I am making.
... He made that bad decision. And he didn’t have the foresight, the maturity, the wisdom to ask himself what if. What if.
[[Image here]]
If you look at the biographical information on Mr. Null, this was almost predetermined. His involvement with the court system was almost predetermined.
[[Image here]]
Mr. Null did not have the mentoring, did not have the role models, did not have the upbringing some of us are fortunate enough to have....
It is a terrible tragedy.... It results from a mistake. The mistakes of a young man who couldn’t see past the length of his arm as to what could have happened, as to what ultimately did happen.
Your Honor, I’m asking you to impose these sentences concurrently as a recognition of that mistake of youth.

. As noted above, I also join part II of Justice Zager’s dissent concluding that the district court did not abuse its discretion in imposing consecutive sentences. In addition, I do not believe that Null’s sentence can be viewed as grossly disproportionate to his crime and therefore unconstitutional within *81 the meaning of Bruegger. See State v. Brueg-ger, 773 N.W.2d 862 (Iowa 2009). Null brought a handgun to a planned armed robbery and, in the course of that robbery, shot the victim twice in the head and killed him instantly. Null was nearly seventeen when he committed this crime; Bruegger, by contrast, involved the use of a preteen juvenile adjudication to dramatically enhance the defendant’s punishment. Id. at 884-85.

. Those factors are:
(a) “the character and record of the individual offender [and] the circumstances of the offense,” Miller, 567 U.S. at -, 132 S.Ct. at 2467 (quotation marks omitted);
(b) “the background and mental and emotional development of a youthful defendant,” id.;
(c) a juvenile's “chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate the risks and consequences,” id., 567 U.S. at -, 132 S.Ct. at 2468;
(d) “the family and home environment that surrounds” the juvenile, "no matter how brutal or dysfunctional,” id.;
(e) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected" the juvenile, id.;
(f) whether the juvenile “might have been charged and convicted of a lesser offense if not for incompetencies associated with youth,” e.g., the juvenile's relative inability to deal with police and prosecutors or to assist his own attorney, id.; and
(g) the juvenile’s potential for rehabilitation, id.
Bear Cloud, 294 P.3d at 47. Note that the list has some overlap. For example, "circumstances of the offense” appears twice. In Rag-land this court eliminates the overlap and thus compresses the list to five factors. See Ragland, 836 N.W.2d at 113 n. 5.

. My colleagues do not say that a district court must make specific findings on each of the Miller factors. To my knowledge, no published opinion in any other jurisdiction has held that such findings are required. Cf. State v. Fletcher, 112 So.3d 1031, 1037 (La.Ct.App.2013) (requiring only that the district court "state the reasons for sentencing on the record,” something which our trial courts are already required to do).

. In lieu of responding to this point, the majority attacks a straw man. The majority accuses me of taking the position that ‘‘[a]ny decision to depart from federal precedent” is "value-laden.” I have not said that. Certainly, it is possible for courts to engage in legitimate forms of state constitutional interpretation and come to a different conclusion from federal precedent. However, simply saying you interpret the state constitution "in a more stringent fashion” does not describe an actual method of interpretation.

. Certain other state courts have expressly rejected the proposition their constitution requires something more than Miller. See Conley, 972 N.E.2d at 879-80 (holding that a LWOP sentence for a 17-year-old defendant was constitutional under a federal analysis because the sentence was discretionary, not mandatory, and further finding that the sentence did not violate Indiana's constitutional prohibition against cruel and unusual punishment); Commonwealth v. Batts, 66 A.3d 286, 288, 298-99 (Pa.2013) (addressing a 14-year-old juvenile offender’s LWOP sentence and finding nothing to suggest that Pennsylvania’s constitutional prohibition against "cruel punishments” required a different approach regarding juveniles than that reflected in prevailing United States Supreme Court jurisprudence).
My colleagues try to justify their approach by stating that Null argued for it — "Null urges *84 that we take the principles of Miller and apply them under the facts of this case under the Iowa Constitution.” Actually, Null's state constitutional argument focused on Bruegger rather than Miller. See n.2.