# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00407-COA

**DAVID MOODY**                                                               **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/01/2024 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL T. DAWKINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 08/26/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     In 2000, David Moody was convicted of capital murder and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. Following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), Moody was granted leave to file a motion to vacate his sentence. In November 2015, Moody filed a motion for post-conviction relief (PCR) in the Perry County Circuit Court pursuant to *Miller*. In February 2024, the circuit court conducted a *Miller* hearing for Moody. Ultimately, the court denied Moody's PCR motion and affirmed his sentence of life imprisonment without eligibility for parole. Aggrieved, Moody appeals. Finding no error, this Court affirms.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Initial Conviction and Sentence

¶2. In the interest of maintaining a uniform series of events across cases, we recount this

Court's prior factual history leading to the murders of Robbie Bond and William Hatcher.

> Though there may be some dispute in the evidence as to the details of these crimes, the larger picture of what transpired on the evening of May 14, 1995, is essentially undisputed. David Moody, then fourteen years old, and his cousin, Kenneth Moody, discovered a young couple alone in a relatively deserted area of Perry County. The two Moodys, acting to carry out a plan to engage in sexual relations with the female half of the couple, Robbie Bond, approached the couple and Kenneth proceeded to beat and stab her male companion, William Hatcher, until he was unable to resist. Bond was also beaten and thrown into the floorboard of the truck driven by the Moodys. After throwing Hatcher's body into the back of the truck, the Moodys transported the couple to Kenneth Moody's trailer where they dug a deep pit to dispose of Hatcher's apparently lifeless body. Kenneth then proceeded to accomplish his original purpose by raping Bond. According to the State, David Moody also raped Bond at that time; however, David Moody testified that he was being coerced by his cousin at that point and that he merely simulated the act of sexual intercourse in order to satisfy his cousin's demands. To some extent, this claim is corroborated by the fact that DNA testing on bodily fluids recovered from the body of Bond excluded David Moody as the donor of any fluid samples recovered.
>
> In all events, the cousins subsequently bound Bond and, leaving her at the trailer, returned to the scene of the original abduction and attempted to destroy any evidence of what had transpired. After returning to Kenneth Moody's trailer, the Moodys forced a running water hose down the young woman's throat in a ghastly attempt to kill her by drowning. This attempt was apparently unsuccessful, since there was testimony that Kenneth Moody proceeded to violently strike Bond in the head with some object before throwing her into the same pit holding the body of her companion, William Hatcher.
>
> David Moody['s] . . . defense consisted chiefly of the assertion that his participation was coerced by threats from his cousin that, if he refused to go along, he would meet the same dismal fate as the young couple. The jury, apparently unpersuaded by David Moody's claim of duress, convicted him of murder in the commission of the felony of rape in the homicide death of Robbie Bond, and of accessory after the fact of capital murder in the death of

2

William Hatcher.

*Moody v. State*, 838 So. 2d 324, 327-28 (¶¶2-5) (Miss. Ct. App. 2002). David was sentenced to life imprisonment in the custody of MDOC without eligibility for parole. He appealed his sentence, and this Court affirmed his conviction and sentence on direct appeal in 2002. *Id.*

## II.     Procedural Posture

¶3.     In 2012, the United States Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012), a landmark decision holding that "mandatory-sentencing schemes" requiring "children convicted of homicide [to] receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes" was a violation of the Eighth Amendment. *Id.* at 489; *see* U.S. Const. amend. VIII. On December 10, 2014, the Mississippi Supreme Court granted Moody's request for leave to file a motion to vacate his sentence.

¶4.     On November 30, 2015, Moody filed a PCR motion in the Perry County Circuit Court, requesting relief pursuant to *Miller*, 567 U.S. at 489. On March 30, 2016, the State filed a response to Moody's PCR motion. The response acknowledged David's age and the terms of his sentence. In so stating, the State requested a re-sentencing for David and specifically recommended his sentence be amended to life imprisonment with eligibility for parole. Over the course of the next several years, the court granted motions from David to appoint counsel and authorized funds for him to obtain an expert in psychology and a mitigation investigator. On February 6, 2024, the successor district attorney filed a response that shifted from the State's previous position and advocated for David's sentence to be upheld and opposed

parole eligibility.

### III. *Miller* Hearing

¶5. The circuit court conducted a *Miller* hearing for David from February 12-14, 2024. At the start of the hearing, the State and the defense stipulated to the introduction of eighty-one exhibits, including the full trial transcript from 2000, education and medical records, rule violation reports (RVRs) from MDOC, an affidavit from Kenneth Moody, and various documents, recordings, and photographs. The hearing also consisted of testimony from several witnesses.

#### a. Gloria Graham

¶6. David first called his aunt Gloria Graham to testify. Gloria testified that her sister Carol (David's mother) married David Earl Moody (Earl), who was "very abusive" toward her. Carol began abusing alcohol during her first pregnancy and continued to drink as the children grew. Gloria testified that before the crimes, David was "happy" and "sweet" but also "mischievous." She paid David a sum of money to receive a GED. The State questioned Gloria on whether she had ever personally observed David being physically abused by Carol, to which Gloria admitted she had not. She also testified that David experienced symptoms of attention deficit disorder (ADHD) growing up. Gloria maintained "[a]s much contact as [she] could" with David after he was incarcerated but was unaware of his behavior while in prison.

#### b. Annis Moody

¶7. David's sister Annis also provided testimony. Annis recalled that their father was "a

4

drug addict" but "loved us in his own way." Following their parents' divorce, their mother began seeing a "bunch of men," and Annis stated most of them were "drunks or abusers[.]" Annis testified that David was her "protector" and "safe point" within the family and was "a good big brother[.]" She recalled attending school with David where she assumed "everybody loved him." He treated her and the girls he was around "respectful[ly]" and "didn't like bullies." She recalled that David received checks after being "diagnosed with schizophrenia[.]" She stated that her mother lost custody of them after one of her boyfriend's molested her. Annis was aware of David talking about wanting to kill that man. Kenneth Moody was Annis's cousin, and she was afraid of him, stating that he had "scary sides to him" and that Kenneth had a habit of huffing gasoline. She also recalled that "[d]uring Davey's trial, Perry County allowed Perry County high school, the whole senior class" to sit in the balcony to watch. She stated that she witnessed Kenneth threaten and fight David "all the time." But overall, she knew that her brother "could have never hurt someone like that for no reason whatsoever" and that he had to have been acting "in fear for his life and he might have done stuff Kenneth told him to do."

### c. William Robinson

¶8. David then called his uncle William Robinson to testify. William recounted that his and David's mother, Carol, had alcoholic parents but were "very lovable." William moved out of their shared family home when he was eight years old. William testified that he "believe[d] with all my heart and soul" that Carol loved her kids but that she also struggled with alcohol problems. Carol and Earl's children "had a rough life coming up," and he

5

observed drugs and alcohol when he visited. Carol and Earl would "melt these pain pills down and shoot them, inject them[,]" calling it "the bathtub." William stated that it was "unbelievable" how Earl would act when he ran out of drugs, and he witnessed Earl physically abuse Carol once as a result. "He was a good guy as long as he had his dope" but also made Carol "go get a tooth pulled to get drugs." He recalled that David and his siblings grew up in a "horrible" environment and "slept on a mattress on the floor." But overall he had "very little" contact with David. Regarding the murders, William thought David "was eleven years old when all this went down" and only recently discovered he was actually fourteen at the time. He described David as "a little bitty fellow." William also mentioned Michael Lee, whom Kenneth had "killed . . . prior to the two kids on the bridge[.]" William stated that at the time of the double murders, "nobody knew about the Michael Lee boy that was killed prior." William was with the fire department searching the river when the search was "called off" after David "finally got away from somebody and went and told what happened."

### d. Michael Joe Robinson

¶9. Michael Joe Robinson, David's half-brother, also provided testimony. He testified that their mother, Carol, "chose other things over her children every day" such as alcohol and men. Michael Joe lived with Kenneth and Doug (Kenneth's father) for certain periods of time. He stated that "everybody knew [Kenneth] was dangerous." He continued, "[e]verybody was afraid of Kenneth," but he was their only source of transportation. David only hung around with him because "he didn't have nowhere else to hang out." Michael Joe

6

testified that Kenneth made lewd comments about women and "would always brag about being able to do whatever he wanted to do." He discussed sexually assaulting women. Michael Joe testified that David told him about the murders one night but expressed he was afraid to tell "[b]ecause Kenneth told him that if he told anybody, [Kenneth] was going to kill him . . . [k]ill whoever it was." Michael Joe and David rode to Forrest County with their aunt BJ (who was also Michael Lee's sister-in-law), and David admitted Kenneth committed both murders on the bridge and had previously killed Michael Lee. David cried when he told Michael Joe and was very scared. When he, David, and BJ arrived in Hattiesburg, they saw a police car in the parking lot and immediately went to inform the officer what happened. Michael Joe stated that he had been told the events of the murder by multiple people, but "nobody sa[id] he was an active participant" in what happened. He also stated that David told him that Kenneth "tried to make" David rape the female victim, but "he couldn't rape her." On cross-examination, the State suggested that David had a few days before he told Michael Joe in which he could have told someone else what happened. Michael Joe stated that David just did not know what to do and was scared of Kenneth.

e.    **Sheriff Billy McGee**

¶10.    Former Forrest County Sheriff Billy McGee also provided testimony. He recalled meeting David in the parking lot of the police department when David approached him. Sheriff McGee stated that he had a woman with him and a boy "a little bit older" who "kept screaming at him, 'You don't have to tell him a damn thing. You don't have to talk to him.'" David still spoke with Sheriff McGee and told him he "kn[e]w something about that incident

7

on the bridge." Sheriff McGee testified that he was not actually aware of the crime at the time but allowed David to continue speaking. Regarding David's demeanor, McGee recalled that "[h]e was a wreck[,] . . . trembling and crying." Sheriff McGee testified the following:

> [H]e related the story of being with his older cousin I think. They had been to a family function, I think, and then they had left riding around together and drinking beer. And they went across the Mahned bridge and they saw a couple on the bridge. And he stopped and offered them beer, which they refused, so he went on down the bridge and then turned around and stopped. And David -- I mean the older cousin told him, "I want some -- I'm going to get some of that." They started back by and he said when we were almost even with the two kids on the bridge, that he bailed out of the truck and started beating the fire out of the male and stabbing him. And she jumped up and ran, so he went to her at that point and I think he beat her into submission and came back. [David] didn't get out of the truck until he was ordered to get out of the truck and sit with the female. They loaded them up in a vehicle and I think one was in the back of the truck and maybe put one in the floor board. Anyway, they went to his uncle's house and unloaded them. The male appeared to be dead according to David. But the female was still moaning and groaning. At that time [Kenneth] told her, "If you'll make it good to me, I'll take you to the doctor." And then he raped her and he told David, "You've got to rape her." . . . [H]e got on top of Robbie because he knew that the older cousin would kill him if he didn't. But he was so afraid that he couldn't have any kind of penetration.

Sheriff McGee testified that he believed then, and at the time of his testimony, that David was telling the truth about the events. He also recounted David saying, "Every time I close my eyes, I see that lady and I can't stand it." Once David finished his account to McGee, he had him go inside and talk to Detective Danny Rigel. David signed a *Miranda* waiver[1] and told his story to the police knowingly and voluntarily.

¶11. As for his own thoughts, Sheriff McGee called the case:

> the biggest injustice of any case. A travesty of justice of any case I worked in

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

my 44-year career. And I told everybody prior to the trial that had anything to do with the trial once he was charged, that I thought it was horrible. No more actual physical part that he played in it other than sitting by somebody and ordered by the older guy to help load them in and ordered unload them. In my mind, he had nothing to do with the killing of anybody.

Sheriff McGee also recounted informing David,

I believe the story that you've told. But I want you to know that if you raped that woman, there is a test that they can do. And if your semen is in that woman, nobody is going to believe another thing that you say about this case." And [David] said, "I promise I didn't rape that woman."

Sheriff McGee noted that the evidence at trial showed the victim had no trace of semen from David.

### f. Sheriff Daniel Harold Rigel

¶12. Present-day Lamar County Sheriff Daniel Harold Rigel testified that he was an officer with the Hattiesburg Police Department at the time of the crimes. David was brought to Sheriff Rigel after speaking with Sheriff McGee and informed him he had information on "what happened to the people on the bridge." Sheriff Rigel read David his *Miranda* rights and asked him multiple times to make sure he was consenting to waive them before signing the authorization forms. "Initially," Sheriff Rigel stated David "just talked" and "went through the whole thing." Once David gave his account of events, Sheriff Rigel asked him "just to answer some questions that he didn't cover." Sheriff Rigel reiterated that David was not a suspect at the time of this meeting and only became a suspect after admitting to his involvement.

¶13. David also gave Sheriff Rigel the location of where the bodies were buried. After the authorities had trouble finding them based on his statement, David personally showed them

9

the location. Sheriff Rigel's notes indicated that Kenneth "told David if [he] didn't rape her, he would bury [David] along with her. David raped her too. Kenneth tied her up with jumper cables and a chain." Sheriff Rigel clarified that he did not go over the definition of rape with David during their conversation. He testified that David showed "[v]ery little emotion" when relaying his story and did not provide an explanation for why it took him four days to come forward. A video of this interview was part of the evidence previously admitted and played during Sheriff Rigel's testimony.

### g. Dana Moore

¶14. Dana Moore, a friend and coworker of victims Bond and Hatcher, became concerned when Hatcher did not show up for work and Bond did not answer her door. Moore knew the pair had gone to the bridge the previous evening, so she went with a couple of others to look for them. Once they arrived, they found Hatcher's truck and Bond's necklace near a knife blade. That evening, Moore and several others went back to the bridge before deciding they would call the police. While there, Kenneth drove by in his white pickup truck and asked with "no expression" whose truck had been left on the bridge. Moore added that a "little smirk came across [Kenneth's] face" as he asked, and he showed "[n]o real concern," appearing "kind of cold and distant."

¶15. After the bodies were found and the case proceeded to trial, Moore began seeing a counselor and "found forgiveness" for David and Kenneth. She wrote letters to both David and Kenneth through the MDOC victim/offender program. Both of them responded to her, but Kenneth "made it pretty clear he didn't want anything else." However, David continued

10

to correspond with Moore "over a period of time," and she would visit him in prison to "ask him questions that [she] had been carrying around" for years. Moore described David as "apologetic" and exhibited "no hostility or anything like that." She stated he also "would draw pictures for [her,]" and they would talk about "things going on in the world." Moore corresponded with David for approximately five years. She asked the circuit court to grant David parole eligibility.

### h.    Kelly Hatcher

¶16.    Kelly Hatcher, sister of the victim William Hatcher, also provided testimony. Kelly recalled that before David came forward, her brother was suspected of killing Bond and fled. She stated that "had David not confessed, we still to this day would not know where [Hatcher] or Robbie [were], what happened to them." The State made a motion to strike Kelly's testimony when she concluded because it was "not relevant to why we are here." The circuit judge stated that he would take that motion under advisement.[2]

### i.    Dr. Beverly Smallwood

¶17.    Dr. Beverly Smallwood was tendered as an expert in forensic psychology without objection. She testified that while there was evidence of malingering—feigning illness—in David's file, it did not have an effect on her opinion of his truthfulness when speaking with her. Smallwood evaluated David in 1995 and again in 2000 before his trial, having multiple "conversations" and "clinical interviews." She "experienced some distress when he got life without parole because he was a young man that had been in a horrific situation." David had

---

[2] The circuit court did not address the motion again and discussed Kelly's testimony only very briefly in its final judgment.

"most certainly experienced trauma in his family and childhood growing up," and "this crime and the experiences around that were traumatic as well." In her initial evaluation, she described David as "high on anxiety[,]" "tended to be more than the average person dependent on the influence or the approval of others." She stated, "[O]n a sadistic scale and on the sociopathy" scale, David was "low" in both evaluations she conducted. Smallwood noticed from her 1995 evaluation and the 2000 evaluation, David's "dependency scale was down," and he "had made a personal determination never to let anybody control him again." In compiling her report, she also viewed David's records from school and a mental health institution. This process involved "interview[ing] people who have the ability to verify whether what he had said about his family was true" and speaking with law enforcement, taking "into account that David had voluntarily gone to law enforcement with the story." Smallwood also attempted to testify about the DNA evidence and how it related to her report, but an objection by the State was sustained.

¶18. She visited David more recently and testified that "he was in pretty good shape" as compared to other people she spoke with who were in prison for multiple years. David was "pretty stable" and "had optimism[,]" reporting "that he had found ways to try to do some good where he was." He also informed her that Kenneth "had written a letter that said that he had forced him to do what he did." The factual representations between 1995 and 2023 were "consistent." Smallwood noted that Dr. Lott's report was "excellent," except she would have added that David had a "tumultuous family situation basically all of his life" and "had been using drugs and alcohol since [being] basically a toddler." David "was not taught how

12

to make choices" and "did not have healthy role models at all[.]" She also stated that the video of David's interview with Sheriff Rigel demonstrated a lack of emotions, but there were multiple explanations for that, such as the "emotion becom[ing] overwhelming." Smallwood concluded that at the time of the crimes, David was "very immature" and "did not have the maturity then even [of] the average fourteen-year-old." Smallwood also testified, over an objection from the State, that she believed David suffered from "post-traumatic stress disorder." The judge acknowledged the objection and would consider it in making his decision.

¶19. Smallwood testified that when she interviewed David in 1995, he was "distraught[,]" both "[c]rying" and "shaking[,]" showing "physiological[] . . . signs of anxiety and grief." In 2000, David acted in "[t]he same way." On cross-examination, the State suggested Smallwood's report to be "very personal[,]" and she stated that although the case "stir[red] emotions" in her, "the things that [she] put in [her] report came on observation and validation." Smallwood clarified again that she did not conduct a *Miller*-type evaluation because Dr. Lott had already done so. She agreed that David knew "right from wrong" at all times throughout the crime. Smallwood stated that she was aware David had "a lot of RVRs" but did not know the specifics of any of them. However, she did not believe any of the violations affected his ability to be rehabilitated "[b]ecause rule violations in a prison culture are not uncommon at all."

### j. Emmitt Sparkman

¶20. Emmitt Sparkman, a corrections officer, superintendent, and deputy commissioner at

Parchman for several years of his career, also offered testimony. Following a voir dire conducted by the State, Sparkman was accepted as a corrections expert. Sparkman stated he "wasn't familiar" with David and did not view him as a problem inmate. He interviewed David on two occasions, once in April 2019 and again in May 2022. Sparkman noted that while there was evidence of David's involvement with a gang in prison, approximately "30% of the individuals" in the system were also affiliated with gangs. Sparkman detailed the reasons inmates might want to join a gang and pressure they might face should they choose not to join. It was his opinion that David was "one of the individuals that get manipulated into joining a gang." David was categorized as a "low level affiliate" with gang activity.

¶21. Officially, David was within the "medium custody range" meaning he was contained in general population and posed a "medium risk." He was initially identified as a "close custody" inmate but was "promoted" to "medium custody" because of his "positive adjustment in the prison system[.]" Of his twenty-four years incarcerated, David spent twenty-two of them in general population. Sparkman testified that it appeared David was identified as having mental health needs, but at one point he had been taken off his medication by the prison psychiatrist and transferred out of the facility typically housing inmates with mental health concerns. After reviewing his record in 2022, Sparkman requested MDOC perform an assessment, which led to David being moved back to the facility for individuals with mental health issues.

¶22. On cross-examination, the court heard that David's RVRs involved "inappropriate demonstration of sexual behavior," such as "masturbating on [his] cell bars" and threatening

14

an officer, "B***h, if I had a knife, I'd chop your motherf*****g head off." David also was noted to have had cellular devices and approximately twelve shanks in his possession "throughout his tenure" in prison. Sparkman testified that he did not believe David to be an inmate incapable of rehabilitation.

### k. Patricia Taylor

¶23. Patricia Taylor was called as David's next witness, and the State objected to her testimony due to hearsay. The court allowed Taylor to testify but acknowledged that any sort of hearsay would not be admissible. Taylor stated that her son was a cellmate with David, and David's positive influence and behavior "gave her back her son" over the past few months. Taylor credited David for her own son's desire to get clean. She also noted that she was not asked to testify at the hearing but did so voluntarily.

### l. Dr. William Chriss Lott

¶24. Dr. William Chriss Lott was, by stipulation, certified as an expert in clinical and forensic psychology. Dr. Lott evaluated David utilizing the *Miller* factors, which involved reviewing "a large body of records[,]" such as discovery, information "pertaining to the arrest[,]" "mental health records," "educational records," "legal records and . . . correctional records." Following this review, Dr. Lott conducted a "clinical interview" with David, reviewing his background and performing "basic personality testing and intellectual testing[,]" evaluating his current mental status, and, afterwards, "attempt[ing] to contact collateral sources" with information.

¶25. Dr. Lott met with David three times, twice in 2019 and once in early 2024 before the

hearing, spending "12 to 16 hours" with him.  Dr. Lott testified that David was diagnosed with ADHD.  David scored in the "average to above average range in the intellectual assessment" and in the "average to high average range" for reading comprehension.  As for David's personality tests, "he responded consistently" and "presented himself in a somewhat overly negative manner" compared to other takers who "tend to present overly positively." David had "significant elevations on the scales assessing anxiety and depression and some thought dysfunction[,]" seeming to be "very anxious" and "very paranoid times" at times. Additionally, David evidenced "significant elevations" in hostility and "had difficulties with interpersonal relationships."  Dr. Lott continued with his *Miller* evaluation as detailed below.[3]  His report was also introduced into evidence.

### i.      Chronological Age

¶26.   Dr. Lott explained the first factor, chronological age, involved considering the correlation between adolescents and "problems with impulsivity, impetuosity, [and] risk taking."  In addition, the factor requires taking into account the "significant differences in brain development for adolescents[,]" which "puts adolescents at much greater risk" for behavior like impulsivity and overreacting.  Dr. Lott testified that David's chronological age of fourteen years old was a "huge factor[,]" as the age is a "very critical . . . very influential or malleable period as an adolescent."  David was especially impulsive due to circumstances out of his control, such as his family life and ADHD.

### ii.      Family and Home Environment

---

[3]  Dr. Lott did not explicitly address the fourth *Miller* factor.  *See infra* ¶37.

¶27. Dr. Lott quoted from research, "It is clear that adverse childhood experiences have a profound, proportionate and long-lasting effect" on one's "emotional state[.]" Dr. Lott listed several instances of adverse childhood experiences David endured, such as his parents' substance abuse and incarceration of "several" family members. David was "clearly neglected both physically and emotionally by both parents[.]" He lacked safety and security as a consequence and did not have a figure in his life he "could trust consistently."

### iii. Circumstances of the Offense

¶28. As for the circumstances of the crimes, Dr. Lott opined that "David was no different" than other adolescents of his age in that he was "heavily peer invested" and tended to "do things to get approval." At the age of fourteen, David "idolized" Kenneth, gearing his "basic self-esteem or self-concept" toward Kenneth's approval.

### iv. Possibility of Rehabilitation

¶29. Dr. Lott then addressed David's potential for rehabilitation. He noted that David had "the intellectual capacity to get out and function in any number of jobs" and to continue his education to "function in any number of professional activities." David had served as a tutor in the prison system and had held various other positions. As for areas of concern, Dr. Lott referenced David's rule violations while incarcerated "reflect[ed] some issues with impulsivity and immaturity" and his "longstanding history of substance abuse" within the prison system. The risk, Dr. Lott opined, was high "for needing treatment" at some point for a relapse of substance abuse, and David would require a "significant level of support" if released. David rested his case at the close of Dr. Lott's testimony.

17

### m. Kenneth Moody

¶30. After David rested his case, the State called Kenneth Moody as a witness. Immediately upon taking the stand, Kenneth invoked his Fifth Amendment right and refused to testify. The circuit judge admonished Kenneth to answer to no avail. The court declared Kenneth an unavailable witness pursuant to Rule 804 of the Mississippi Rules of Evidence.

### n. Andy Davis

¶31. The court permitted the State to call Investigator Andy Davis with the Forrest and Perry County district attorney's office for testimony as a result of Kenneth's refusal to testify. Davis recently accompanied the State to a meeting in the Forrest County jail with Kenneth. He agreed that the questions Kenneth had been asked on direct examination were of the same nature as the questions that he answered in the meeting. Davis prepared a written memorandum following the meeting with Kenneth, effectively summarizing "everything" that had been discussed. The memo was entered into evidence for identification purposes only. Davis stated that Kenneth "explained that he had had a run-in with some Gangster Disciples while he was in prison and . . . was in fear [for] his life." Kenneth also stated that his contraband cell phone had died, and he did not have a charger. Kenneth asked David for his charger, and David allegedly told Kenneth he "would have to write an affidavit trying to exonerate him in this case" in exchange for the charger. Kenneth agreed.

¶32. At the meeting with the State in the jail, Kenneth stated that his affidavit "was not true." He said that "he did not threaten David" during the commission of the crimes but "could see where David might have felt threatened." However, David made comments

"about doing some things" when they initially approached the bridge and saw Robbie and Hatcher. Kenneth stated that while he was "handling [Hatcher,]" David "chased Robbie down and held her on the bridge." As for the rape of Robbie, Kenneth stated "that he didn't know that David actually penetrated Robbie," but "he was on top of her going through the motions." He also claimed, "David was the one that actually hit Robbie in the head with a sledgehammer" after the water hose torture occurred. Kenneth recounted that on the day following their commission of the crimes, David was "bragging to his brother Michael Joe about what they had done the night before." Kenneth also commented that the crimes would not have occurred "but for David."[4] Following Davis's testimony, the State rested, and David did not call any witnesses in rebuttal, concluding the hearing.

## IV. Final Sentencing and Appeal

¶33. On March 1, 2024, the circuit court entered its final judgment. The court's decision noted that only one *Miller* factor weighed in favor of parole eligibility (family and home environment); one was neutral (incompetencies of youth); and the other three weighed against parole eligibility (chronological age, circumstances of the offense, and possibility of rehabilitation). We discuss the three factors that weighed against parole eligibility in the discussion portion of this opinion. The circuit court concluded,

> [T]his was not a spur of the moment event, like the classic example of a shooting involved robbery at a convenience store. This was a sustained series of heinous crimes over the course of several hours involving brutalization, rape, torture and the murder of two people. David Moody actively participated in these crimes and failed to report them during the hours when Robbie Bond

___

[4] The court noted in its final judgment that it did not consider Davis's testimony in reaching its determination.

19

could have been saved. Instead, he waited four days after her death to contact law enforcement.

Again, the court noted it did not consider the hearsay testimony given by Investigator Davis when making his decision. David's PCR motion was ultimately denied. He appealed on March 29, 2024.

## STANDARD OF REVIEW

¶34. "[T]here are two applicable standards of review in a *Miller* case." *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018). "First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Id.* (citing *Smothers v. State*, 741 So. 2d 205, 206 (Miss. 1999)). "If the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id.* (citing *Hampton v. State*, 148 So. 3d 992, 998 (¶16) (Miss. 2014)).

## DISCUSSION

¶35. David argues that the circuit court erred in its consideration of the *Miller* factors by denying his PCR motion. In addition, he contends that his sentence is unconstitutional because he "did not plan, intend, or commit the act of murder" of the victims. We address these arguments in turn.

### I.     *Miller* **Factors**

¶36. Again, *Miller* is a Supreme Court decision which held that "mandatory-sentencing schemes" requiring "children convicted of homicide [to] receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes" are a violation of the Eighth Amendment. *Miller*, 567 U.S. at 489;

20

*see* U.S. Const. amend. VIII. The crux of David's appeal before this Court rests upon the *Miller* holding, which was adopted by our state supreme court in *Parker v. State*, 119 So. 3d 987 (Miss. 2013). And while *Miller* did bring an end to juveniles being sentenced under a statutorily mandated term of "life without parole," the decision "does not prohibit sentences of life without parole for juvenile offenders." *Parker*, 119 So. 3d at 995 (¶19). "Rather, it requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* (quoting *Miller*, 567 U.S. at 480).

¶37. To reach this decision, the United States Supreme Court identified five factors the sentencing authority must consider. Those five factors were later adopted by the Mississippi Supreme Court in *Parker*.[5] Those factors include:

> (1) chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; (2) family and home environment that surrounds the defendant; (3) circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; (4) that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth; and (5) the possibility of rehabilitation.

*Dotson v. State*, 328 So. 3d 659, 667 (¶28) (Miss. Ct. App. 2021) (citing *Miller*, 567 U.S. at 477-78; *Parker*, 119 So. 3d at 995-96, 998 (¶¶19, 26)). David calls attention to three factors in particular: chronological age, circumstances of the crime committed, and possibility of rehabilitation. He argues the circuit court judge erred when he weighed those factors and ultimately ruled against parole eligibility.

---

[5] *Parker*, 119 So. 3d at 995-96, 998 (¶¶19, 26).

¶38.     Before addressing those factors individually, this Court notes that David's argument partly involves an assertion that the circuit court utilized "the wrong legal standard" in terms of its review of his chronological age. In reality, David's argument asserts the circuit court inappropriately weighed the chronological-age factor. In *Parker*, the Mississippi Supreme Court instructed, "the sentencing judge must conduct a hearing and consider the several factors that the *Miller* opinion identified as relevant to the sentencing decision." *Chandler*, 242 So. 3d at 68 (¶¶8-9). David was allowed to hire a mitigation expert who testified at the *Miller* hearing at the taxpayers' expense. The circuit court held a *Miller* hearing over the course of three days, *see supra* ¶¶5-32. The *Miller* factors were explicitly referred to in the attorneys' examinations of expert witnesses and served as the groundwork for the entire proceeding. Finally, the circuit court issued a written decision discussing the *Miller* factors and their application to the case.[6]

### a.     Chronological Age

¶39.     David first argues that the judge erred by disregarding the mitigating significance of the first *Miller* factor after finding David was of an average intelligence level. The final judgment indeed stated that "David's age was not a significant factor in his ability to distinguish between right and wrong due to the factual circumstances of this case." But that

---

[6] Trial courts are only required to "take into account and consider the factors identified in *Miller* before sentencing." *Chandler*, 242 So. 3d at 68 (¶9) (citing *Miller*, 567 U.S. at 480; *Parker*, 119 So. 3d at 995, 998 (¶¶19, 26)). "[N]othing in *Miller* or *Parker* requires trial courts to issue findings on each factor or limits trial courts to considerations strictly personal to the juvenile offender." *Id.* This Court notes, then, that the circuit court here absolutely "exceeded the minimum requirements of *Miller* and *Parker* by specifically identifying every *Miller* factor in its order" and took the additional step of providing a detailed analysis as to each factor. *See id.* at 70 (¶16).

statement is backed up and followed by approximately three pages of the court's reasoning for that finding.

¶40.   The court recognized that David's participation was "lengthy" and "over an extended period of time[,]" rather than, "for example, a snap decision to take the life of an individual in a high-pressured situation."  The court noted that David had "at least two periods of time alone with Robbie[,]" outside of Kenneth and his threats, "where she was still alive."  David "sat with Robbie to prevent her from leaving the bridge" and assisted Kenneth in binding her, loading her into Kenneth's vehicle, and transporting her to the trailer.  David assisted Kenneth in digging graves and burying both bodies, watched and did nothing as Kenneth forced a water hose down Robbie's throat and ran the water for several minutes, and "mounted Robbie" after being instructed to rape her by Kenneth.  The judge even discussed the proximity of approximately nineteen residential homes to the crime scenes and emphasized David's failure to flee or attempt to seek help at any of those homes.  Robbie was forced to fight "for her own life by shielding her face and chest with her arms," and the court was "not persuaded that a fourteen-year-old with David's intelligence and the ability to tell right from wrong would be unmoved by the victim in these terrible circumstances."

¶41.   Nothing in the circuit court's order suggests that David's chronological age was considered any less than the remaining *Miller* factors.  Rather, the circuit judge found the factor to be insignificant following a thorough analysis recounting numerous details as to David's participation in the subject crimes. It is undisputed that David was fourteen years old at the time the crimes were committed.  But that is not enough on its own to weigh in favor

23

of parole eligibility, for "**no rebuttable presumption exists** in favor of parole eligibility for juvenile homicide offenders." *Chandler*, 242 So. 3d at 69-70 (¶15) (emphasis added). After reviewing the circuit judge's analysis of the first factor, this Court finds no evidence of any abuse of discretion.

### b.    Circumstances of the Offense

¶42.    The horrific circumstances of Hatcher's death and Robbie's rape, torture, and death have been recounted in detail, *see supra* ¶2. David argues that he was a juvenile "active" in the crime "but not a willing accomplice," and his denial of parole eligibility would be the state's "first *Miller* case affirming [life without parole] for someone who did not kill or plan the murder." But regardless of David's story, he was convicted of capital murder. That verdict was reached by a jury of David's peers who observed the evidence presented in full. The circuit judge heard all of David's *Miller* hearing testimony and reviewed the evidence. Overall, the judge was simply "not persuaded that David was a terrified bystander who bears diminished responsibility for these crimes."

¶43.    After detailing the gruesome facts of the case, the judge concluded that "David actively participated in [the] crimes by sitting with [Robbie] to prevent her from leaving the bridge while his cousin Kenneth killed William Hatcher[; by] placing her into the vehicle in such a manner that she could not flag down any passing vehicle for help; [by] transporting her to [the] trailer; [by] watching Kenneth beat, rape and torture her with a water hose; [by] removing his clothes and climbing on top of Robbie Bond; [and by] burying the bodies of Robbie Bond and William Hatcher and helping hide and/or destroy the evidence of these

24

crimes."

¶44. The circuit judge did state that David should be "commended" for coming forward to report the crimes to the police. But in the end, this singular favorable fact was overcome by David's "active participa[tion]" and failure to report the crimes when Robbie was still alive and could have been rescued. This Court recognizes the circuit court's vast discretion in sentencing and finds no abuse of discretion in the circuit court's determination that this *Miller* factor weighs in favor of life without parole. It is not this Court's responsibility to determine whether David was or was not a terrified bystander. Rather, we are tasked with reviewing the decision made by the circuit court for an abuse of discretion, if any. *Owens v. State*, 17 So. 3d 628, 632 (¶8) (Miss. Ct. App. 2009) (recognizing the circuit court's "complete discretion in sentencing" (quoting *Vardaman v. State*, 966 So. 2d 885, 891 (¶28) (Miss. Ct. App. 2007)). The court's decision to weigh this factor against David's parole eligibility was not baseless by any means.

### c. Possibility of Rehabilitation

¶45. Finally, David asserts that the circuit court erred by determining the rehabilitation factor did not weigh in favor of parole eligibility. He takes particular issue with the court's consideration of his background prior to the commission of the crimes. Indeed, the court references the incident in which ten-year-old David "was found intending to smother his mother's boyfriend with a pillow." David was also treated "for having ideations of killing people" in the year before the bridge murders. There is no indication as to whether the possibility of rehabilitation factor must only be based upon a defendant's incarcerated

25

behavior only. Further, the circuit court's decision was **not** merely based upon David's previous ideation of murdering his mother's boyfriend. The court's order also heavily mentioned David's behavior while in MDOC's custody.

¶46. The court's order consisted of a thorough recounting of the evidence presented for this factor. David "joined the Simon City Royals gang" after being incarcerated. The record on appeal showed "at least sixty-six rule violations" attributed to David while he has been in jail. Those violations include violent behavior such as physically striking an officer, threatening an officer that he would "chop [their] motherf*****g head off," possessing approximately twenty shanks over the course of ten years, and possessing at least seven contraband cell phones. As with the previous factors, the court recognized David's positive accomplishments as well, such as tutoring other inmates, completing anger management programs, and assisting a life skills teacher. However, "these achievements [we]re not enough to make a determination that David can be rehabilitated."

¶47. We are not tasked with determining whether rehabilitation is possible for David. We are evaluating whether the court's decision that the factor weighed against David was an abuse of discretion. This Court finds no abuse of discretion because David's gang activity, threats, possession of makeshift weapons, "difficulty interacting with authority figures[,]" and risk for recidivism all support the circuit court's conclusion. *See Booker v. State*, 349 So. 3d 756, 768 (¶36) (Miss. Ct. App. 2019) (finding substantial evidence to show rehabilitation was not likely, partly based upon a record evidencing "a series of rules violations for fighting, possessing and using drugs, refusing to obey orders, and possessing

shanks, gang-related material, and other contraband").

## II. Degree of Culpability

¶48. David contends that because he "did not plan, intend, or commit the act of murder" of the victims, his sentence is unconstitutional. He specifically points to the United States Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48, 82 (2010), which stated, "[T]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender **who did not commit homicide**." *Id.* (emphasis added). David argues the jury was instructed that if the evidence led them to a finding that David "was present and intended to give any assistance . . . or that he in fact rendered any assistance" to Kenneth, they should return a verdict of guilty. However, this contention misrepresents *Graham* and the crimes for which David was convicted.

¶49. *Graham* indeed held that sentencing a juvenile "who did not commit homicide" to life without parole was a constitutional violation. *Id.* Nonhomicide offenders were described as "defendants who do not kill, intend to kill, or foresee that life will be taken" and "categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69 (citing *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v. Arizona*, 481 U.S. 137 (1987); *Coker v. Georgia*, 433 U.S. 584 (1977)).

¶50. In David's case, Robbie saw two unknown males (one of whom was David) jump out of a truck that had passed the victims earlier and turned around for the specific purpose of "get[ting] some of that." Kenneth immediately attacked Hatcher, and Robbie tried to run away. David ran after her and restrained her while her companion was murdered. David

assisted in moving both her and the body of her recently deceased companion into a vehicle to be taken to a second location (passing approximately nineteen houses on the way without making any attempt to get help). He watched Kenneth rape her, and then David got "on top of her" and either raped or simulated raping her. Next, he was present for and watched as a water hose was shoved down Robbie's throat in an effort to drown her. When that was unsuccessful, he either watched Kenneth kill Robbie with a sledgehammer to the head or delivered the blow himself.

¶51.    We are not deciding in this case whether David was the actual killer. A jury convicted David of **capital murder**. He is, as far as the law is concerned, a murderer. That verdict was based partly upon evidence of David's own statements made to others and to the authorities, as well as a video recording of his interview with the police. This is not David's chance to relitigate the facts of the offense or attempt to prove his innocence. "[W]hen a PCR petitioner . . . receives permission to proceed with a *Miller*-based claim in the trial court, what is going on **is not resentencing**." *Id.* (citing *Wharton v. State*, 298 So. 3d 921, 928 (Miss. 2019)). "Rather, the petitioner is being given the opportunity to show that, under application of the *Miller* factors, the offender's life-without-parole sentence is unconstitutional." *Id.*

¶52.    In sum, David was not involved in a nonhomicide offense as referenced in *Graham*. He was instead involved in a criminal offense in which a jury determined he was guilty of capital murder and accessory after the fact to capital murder. David cannot be present, help carry out in full a design to kill, and avoid the consequences or circumvent accountability of

28

the law by arguing he was not the one who delivered the final killing blow. He knew Kenneth was killing Hatcher when, instead of allowing Robbie to escape, David chased her down, brought her back to the first murder scene, held her against her will, helped transport her to another murder scene when Robbie Bond was raped, tortured, and murdered—all with David's assistance and participation. The jury convicted him of capital murder. His offense is not one contemplated under *Graham v. Florida*; therefore, this issue is without merit.

## CONCLUSION

¶53. Our supreme court has held "that no rebuttable presumption exists in favor of parole eligibility for juvenile homicide offenders." *Chandler*, 242 So. 3d at 69-70 (¶15). The *Miller* decision instead "explicitly foreclosed imposition of a mandatory sentence of life without parole on juvenile offenders." *Id.* (citing *Jones v. State*, 122 So. 3d 698, 702 (¶10) (Miss. 2013)). David was not "automatically resentence[d] . . . to life in prison[.]" *Id.* at 70 (¶22). The circuit court "held a hearing and, after considering all that was presented as well as the entire court file, sentenced [David] to life in prison." *Id.* In other words, the circuit court "satisfied its obligation under *Miller* and *Parker*[.]" *Id.* at 70-71 (¶22). Therefore, we affirm the circuit court's judgment.

¶54. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶55. The United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460, 479

29

(2012), that mandatory life without parole sentences for juvenile offenders violate our constitution's prohibition of cruel and unusual punishment. In holding that a juvenile "offender's youth and attendant characteristics" must be considered, the Court noted that "children are constitutionally different from adults for purposes of sentencing" for many reasons, including that they "are more vulnerable . . . to negative influences and outside pressures" and that "[t]hey have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* at 471, 483 (quoting *Roper v. State*, 543 U.S. 551, 569 (2005)). Developmentally, children have "transient rashness, proclivity for risk, and [an] inability to assess consequences[,]" "deficiencies" which will be reformed "as the years go by and neurological development occurs[.]" *Id.* (quoting *Roper*, 543 U.S. at 570).

¶56.    Significantly, even though the Court declined to categorically prohibit life without parole sentences for juveniles, the Court stated "[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* at 479. "[I]ncorrigibility is inconsistent with youth." *Id.* at 473 (internal quotation marks omitted) (quoting *Graham v. Florida*, 560 U.S. 48, 72-73). In fact, it is "the rare juvenile offender whose crime reflects irreparable corruption." *Miller*, 567 U.S. at 479-80 (quoting *Roper*, 543 U.S. at 573). Despite these pronouncements, Mississippi's appellate courts have routinely affirmed the imposition of life without parole sentences on appeals from *Miller* hearings. *See Chandler v. State*, 242 So. 3d 65 (Miss. 2018); *Miller v. State*, 327 So. 3d 121 (Miss. Ct. App. 2020); *Dotson v. State*, 328 So. 3d 659 (Miss. 2021); *Shoemake v. State*, 323 So. 3d

1093 (Miss. 2019); *Ealy v. State*, 324 So. 3d 306 (Miss. Ct. App. 2019).

¶57.   *Miller* requires an examination of the following factors: age and its hallmark features, family and home environment, circumstances of the murder, the incompetencies of youth, and the possibility of rehabilitation. *Miller*, 567 U.S. at 477-78. Here, I would find that the trial court abused its discretion in weighing these factors to determine that Moody should be re-sentenced to life in prison without eligibility for parole. The circumstances do not support a finding that Moody was "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 577 U.S. 190, 209 (2016). Instead, the testimony overwhelmingly supports that Moody was caught in a circumstance in which the characteristics of youth inhibited his capacity to "extricate [himself] from [a] horrific, crime-producing setting[]." *Miller*, 567 U.S. at 471.

¶58.   Of particular consideration is the circumstance that Moody, who was just fourteen years old, was acting under the influence and direction of his older cousin Kenneth. Dr. Beverly Smallwood testified that Moody was "very immature" and that he "did not have the maturity then even [of] the average fourteen-year-old." Dr. Lott testified that Moody's "chronological age was a huge factor." Moody's relatives, including his half-brother Robinson, testified that "[e]verybody was afraid of Kenneth." Moreover, the child had limited options to control the environment. Robinson testified that Moody would hang out with Kenneth because "he didn't have nowhere else to hang out. There wasn't no ride down there . . . . It wasn't like now. You don't have no phone. We were just stuck there. Nobody had a phone, no way to get away from there. Just stuck." These facts are distinguishable

31

from, *Shoemake*, for example, in which we affirmed a sentence of life without parole eligibility for a juvenile defendant who was "seventeen years and 347 days old when he committed the crime." *Shoemake*, 323 So. 3d at 1102 (¶33). In *Shoemake*, we also explicitly contrasted the facts of *Miller*, observing that "in *Miller* and its companion case, . . . both defendants were fourteen years old at the time of the crime in question." *Id.*

¶59. As recognized by *Miller*, children lack the developmental competency we presume is present when punishing adults. In *Miller*, examining the behavior of a fourteen-year-old defendant, the United States Supreme Court stated that the defendant's choice to continue participating in the course of events shows that "age could well have affected his calculation of the risk that posed, as well as his willingness to walk away at that point." *Miller*, 567 U.S. at 478.

¶60. Moody is faulted by the trial court and majority for the delay in contacting the police. Yet *Miller* requires consideration of the developmental incompetency and general inexperience that would limit a fourteen-year-old's ability to process and respond how an adult would in similar circumstances. According to Robinson's testimony, the fourteen-year-old's understanding of what his options were during the course of the crime was revealed: "[h]e said he should have jumped off that bridge or he said he should have let Kenneth just kill him." And in contrast to other *Miller* cases, Moody was not conspiring in criminal activity at the time Kenneth abruptly decided to target the victims. *See Ealy*, 324 So. 3d at 309 (¶2) (sixteen-year-old defendant planned and committed armed robbery and crime escalated to homicide). Moody was simply a passenger in his older cousin's vehicle.

32

¶61. A fourteen-year-old child is practically dependent on those around him for safety and transportation. The testimony of Robinson supports that the ongoing fear of Kenneth was a significant factor in Moody's delay in making contact with the police. The night Moody told Robinson what had happened, Robinson said that Moody was watching for Kenneth's truck and that "we stayed up looking, crying and looking out the window. We heard Kenneth's truck go by. We really thought that Kenneth had told him that if he told me anything, that he was going to have to kill me too. . . . [H]e said if—like when we heard that truck, he was like quit crying. Don't admit I told you anything."

¶62. Consideration of the circumstances of the crime, while relevant, is not intended to obviate consideration of the characteristics of youth. In *Miller*, to support the prohibition on mandatory life sentences for homicide crimes, the United States Supreme Court noted that the characteristics of children, "their distinctive (and transitory) mental traits[,] and environmental vulnerabilities" are not "crime-specific." *Miller*, 567 U.S. at 473. "Those features [of youth] are evident in the same way, and to the same degree, when [a non-homicide crime] turns into a killing." *Id.* Certainly, to be guilty of a crime, some level of active participation is required. But consideration of the circumstances of the crime under *Miller* goes not to guilt or innocence, but to permanent incorrigibility.

¶63. A capital murder case never has fragrant facts. I am concerned that the trial court and the majority misguidedly placed undue weight on this factor (circumstances of the crime), particularly given the context that the fourteen-year-old juvenile defendant was acting under the influence of a violent and controlling adult. Our post-*Miller* jurisprudence more

33

frequently addresses an older juvenile defendant who played a forward role in the violence of the crime. *See Shoemake*, 323 So. 3d at 1096 (¶5) (seventeen-year-old defendant strangled victim with an extension cord); *Ealy*, 324 So. 3d at 309 (¶2) (sixteen-year-old defendant planned to commit armed robbery); *Chandler*, 242 So. 3d at 67 (¶3) (seventeen-year-old defendant shot victim).

¶64. Concerning the prosecution of Moody, Billy McGee, the sheriff of Forrest County at the time of the murders, testified that "I think it's the biggest injustice of any case. A travesty of justice of any case I worked in my 44-year career. And I told everybody prior to the trial that had anything to do with the trial once he was charged, that I thought it was horrible. No more actual physical part that he played in it other than sitting by somebody and ordered by the older guy to help load them in and ordered unload them. In my mind, he had nothing to do with the killing of anybody."

¶65. The consideration of rehabilitation goes also to the rareness of irreparable corruption. *See Young v. State*, 294 So. 3d 1238, 1239 (¶1) (Miss. Ct. App. 2020) (remanding for new *Miller* hearing on finding that counsel was ineffective for failing to present evidence of rehabilitation in prison);[7] *Chandler*, 242 So. 3d at 71 (¶24) (Waller, C.J., dissenting). Positive indicators include Moody's transfer to medium security, which is less common for someone serving life without parole. Dr. Smallwood testified that with adequate support, Moody could successfully function outside prison.[8]

---

[7] On remand, Young was resentenced to life imprisonment with parole eligibility in December 2021, and he was released on June 4, 2025.

[8] We should consider as well, and as a matter of fairness, that post-*Miller* convictions

34

¶66. "The concept of proportionality is central to the Eighth Amendment." *Graham*, 560 U.S. at 59. "'Punishment for crime should be graduated and proportioned' to *both* the offender and the offense." *Miller*, 567 U.S. at 469 (quoting *Roper*, 543 U.S. at 560) (emphasis added). Abuse of discretion is a deferential standard, not an insurmountable standard. If a finding of abuse of discretion is not warranted in this case, then in what case would it be warranted? I would find that the trial court abused its discretion in determining that life without eligibility for parole was the appropriate sentence for Moody after consideration of the *Miller* factors. I therefore respectfully dissent.

**McDONALD, J., JOINS THIS OPINION.**

---

apply this factor to juvenile offenders prior to the start of their sentences. Our retroactive application of *Miller* should take into consideration the unique survival pressures of a prison environment. As indicated by the testimony at this hearing, poor behavior in prison is not necessarily an indicator irreparable corruption in a free life.