# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-KA-00549-COA

**JAMES JOHNSON A/K/A JAMES NATHANIEL JOHNSON**　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/29/2025 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: INDIA MARIAH SPRINKLE |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/21/2026 |
| MOTION FOR REHEARING FILED: | |

### BEFORE BARNES, C.J., McDONALD AND WEDDLE, JJ.

### McDONALD, J., FOR THE COURT:

¶1.　James Johnson appeals from the Madison County Circuit Court's re-sentencing order in which the court, following a *Miller v. Alabama*[1] hearing, sentenced Johnson to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. On appeal, Johnson argues that the court misinterpreted the facts and misapplied the law. Having considered the record, arguments of counsel, and relevant precedent, we find no error and affirm the circuit court's order and

---

[1] 567 U.S. 460 (2012).

Johnson's sentence.

## Facts and Procedural History

¶2.     In 2001, sixteen-year-old Johnson and his older half-brother, James Howard, robbed a convenience store in Madison County. A jury determined that during the robbery, Johnson shot and killed the store clerk. Johnson was convicted of capital murder in August 2005 and given the only sentence available under Mississippi Code Annotated section 97-3-21 (Rev. 2000) in effect at the time—life imprisonment without parole.[2] Johnson appealed, and this

---

[2] Section 97-3-21, "Homicide; penalty for first- or second-degree murder or capital murder," now provides:

(1) Except as otherwise provided for a juvenile offender in subsection (2) of this section, every person who is:
. . . .
      (c) Convicted of capital murder shall be sentenced

          (i) to death;
          (ii) to imprisonment for life in the State Penitentiary without parole; or
          (iii) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(c)(iii).
. . . .

(2)(a) For the purposes of this section, "juvenile offender" means a person who had not reached the age of eighteen (18) years at the time of the commission of the offense.
    (b) A juvenile offender who is convicted of first-degree murder after July 1, 2024, may be sentenced to life imprisonment in the custody of the Department of Corrections if the punishment is so fixed by the jury. If the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at not less than twenty (20) nor more than forty (40) years in the custody of the Department of Corrections.
    (c) A juvenile offender who is convicted of capital murder after July 1, 2024, may be sentenced to life imprisonment in the custody of the Department of Corrections or life imprisonment without eligibility for parole in the custody of the Department of Corrections if the punishment is so fixed by the

2

Court affirmed his conviction and sentence in *Johnson v. State*, 956 So. 2d 358, 360, 369 (¶1, 27) (Miss. Ct. App. 2007).

¶3. According to the facts as stated in that reported opinion, after the victim was found dead, police discovered a trash can containing three cash drawers similar to those missing from the convenience store. *Id*. at 361 (¶3). A fingerprint on one matched Johnson's, and he was arrested and indicted for capital murder. *Id*. at (¶¶3-4). This fingerprint was the only physical evidence linking Johnson to the crime. *Id*. at (¶5). But the State also presented witnesses who testified that Johnson and Howard had talked about committing the robbery and that Johnson had confessed to killing the store clerk. *Id.* On appeal, we found no error by the circuit court in giving the jury instructions or in allowing testimony from witnesses. *Id*. at 369 (¶26). We affirmed the court's judgment and Johnson's sentence of life imprisonment in the custody of MDOC. *Id*. at (¶27).

¶4. During his incarceration between 2005 and 2016, Johnson was repeatedly cited for violations of prison rules, including threatening an officer and possessing gang paraphernalia and other contraband. He received thirty citations for such behavior over an eleven-year period.

---

jury. If the jury fails to fix the penalty at life imprisonment or life imprisonment without parole, the court shall fix the penalty at not less than twenty-five (25) nor more than fifty (50) years in the custody of the Department of Corrections.

   (d) For a juvenile offender who was convicted of first-degree murder or capital murder prior to July 1, 2024, and who is entitled to a hearing under this subsection, the judge who presided over the trial, or a judge appointed by the senior circuit judge, if the presiding judge is unavailable, shall fix the penalty.

Miss. Code Ann. § 97-3-21 (Supp. 2024).

¶5.    In 2012, the United States Supreme Court decided *Miller v. Alabama*, which held that mandatory sentencing of juveniles to lifetime incarceration without the possibility of parole violates the Eighth Amendment's ban on cruel and unusual punishment. *Miller*, 567 U.S. at 479. However, the Supreme Court stated, "Our decision does not categorically bar a penalty for a class of offenders or type of crime . . . . [I]t mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id*. at 483. The factors included in a *Miller* analysis, which are found in *Dotson v. State*, 328 So. 3d 659, 667 (¶28) (Miss. Ct. App. 2021), include:

> (1) "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "family and home environment that surrounds [the defendant]"; (3) "circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth"; and (5) "the possibility of rehabilitation."

*Id*. (quoting *Miller*, 567 U.S. at 477-78).

¶6.    Seeing some chance at freedom because of *Miller*, on January 23, 2013, Johnson filed a motion to obtain the record and transcript of his criminal trial. He later filed a motion to vacate his sentence and requested a re-sentencing hearing because he had committed his crime when he was a juvenile, and he was sentenced under a mandatory sentencing statute as was the defendant in *Miller*. The circuit court granted Johnson's petition and vacated his sentence on April 25, 2016. The re-sentencing hearing was set for July 25, 2016, but was subsequently continued several times between that date and one in October 2019.

¶7.    In October 2019, Johnson filed a motion for additional time to file a motion for funds

to hire two experts, one in psychology and one in mitigation investigation. The court granted his motion. Johnson also filed a motion for jury sentencing pursuant to this Court's decision in *Wharton v. State*, 334 So. 3d 136, 140-41 (¶¶14-15) (Miss. Ct. App. 2018), which held that a *Miller* re-sentencing hearing could be conducted before a jury. The Mississippi Supreme Court later reversed our decision in *Wharton v. State*, 298 So. 3d 921, 925 (¶19) (Miss. 2019), and held that a defendant had no constitutional right to have the *Miller* factors decided by a jury. Johnson later withdrew his motion for jury sentencing.

¶8. On July 27, 2021, Johnson filed a motion for funds to hire Dr. Criss Lott, a psychologist, to evaluate him and testify at his *Miller* hearing. On October 21, 2021, the court granted Johnson's motion. Dr. Lott's January 2025 report was filed with the court on February 13, 2025. With the court's permission, the parties stipulated to the admission of Dr. Lott's report without the need for Lott to appear at the re-sentencing hearing that was held on April 16, 2025.

### A. Testimony and Evidence Presented by the State

¶9. The hearing began with the court's admission of Dr. Lott's report into evidence. The State pointed out that Dr. Lott detailed the numerous "Rules Violation Reports" (RVRs) that Johnson had accumulated and for which he had been disciplined by the Mississippi Department of Corrections. Thirty RVRs were listed from 2006 through November 2016, including refusal to obey authority and possession of a sharpened object, marijuana, and cigarettes. One time Johnson flooded his cell. The State also asked the court to take judicial notice of a judgment entered on August 23, 2021, in Madison County Circuit Court Cause

No. 2020-0444, where Johnson pled guilty and was convicted of possessing a cell phone in a correctional facility, possession of a controlled substance, and conspiracy to furnish a cell phone in a correctional facility. Johnson was sentenced to serve three years for each conviction. The court's order on these convictions was entered into evidence.

¶10. The State called Joshua Fish, an investigator with the Madison County Sheriff's Department, who testified about Johnson's latest conviction. Fish stated that in 2019, jail staff contacted his office because they had found contraband in Johnson's cell. Fish investigated and found multiple little bundles of Spice (a blend of dried plant material that is laced with a synthetic cannabinoid) wrapped in paper and a cell phone in the middle of a hollowed-out tortilla container. Johnson also had numerous Ramen noodle packets in which Fish found methamphetamine and Spice. Fish learned that Johnson's girlfriend and sister were supplying Johnson with this contraband and that they were running a statewide, multiple-jail operation.

¶11. The State then directed the court to our May 2007 opinion in Johnson's appeal of his original conviction. The State pointed out that this Court rejected Johnson's argument that he was influenced by his half-brother. The State also referred to a portion of the opinion where a witness at Johnson's original trial had testified that Johnson told her, "I killed the MF [store clerk] and I'll kill him again."

### B. Testimony and Evidence Presented by Johnson

¶12. Latasha Johnson, Johnson's older sister, testified that James Howard was her and Johnson's older half-brother. They first met Howard when Howard was brought to their

6

father's funeral in handcuffs because he was incarcerated in California at the time.[3] When Howard was finally released, he returned to Mississippi and took Johnson, who was then fifteen, "under his wing." Latasha told Johnson to stay away from Howard, who was eight years older than him, but Johnson looked up to him. Latasha told the court that Johnson had gone through different situations in prison, and he has "awakened in a way only God could do." However, on cross-examination, Latasha admitted that she was part of the criminal drug and cell phone conspiracy that led to Johnson's conviction in 2020, and she said that no one forced Johnson to participate in those crimes.

¶13.     Clara Thompson, Johnson's mother, testified that she had only known Howard a few years before he got out of prison and moved to Mississippi. Howard was a child of Johnson's father by another woman. Thompson told Howard to stay away from her house because he sold drugs and "was underhanded, undermining other young men, even his own siblings." She also warned Johnson to stay away from Howard.

¶14.     Johnson then testified and presented the court with several certificates he had earned while in prison, including one showing completion on July 5, 2016, of a program offered by the facility called, "The Resolution for Men." Others included a completion certificate of the "Fundamentals of Faith Bible Study" conducted by Mt. Nebo Prison Ministry (undated), another for completing a twelve-week "Spiritual Growth" class on May 20, 2023, and a certificate for completing a "30-Day Fast Track MRT-Moral Reconation Therapy"[4] and drug

---

[3] Johnson was eight years old when his father died.

[4] Reconation is a type of therapy aimed at helping individuals develop moral reasoning skills and make better decisions.

7

rehabilitation on January 26, 2024. On February 9, 2024, Johnson completed a fifteen-session, thirty-hour course in the facility's re-entry academy. Johnson said he decided to take those classes when he learned of the *Miller v. Alabama* case, which gave him a sense of direction and purpose to get his life back together. Johnson explained that since 2016, he had only four RVRs, and those were all dismissed because MDOC cited the wrong person.

¶15. Johnson testified that he had a close relationship with his father, who was his first role model. Johnson said that when his father died, he was mentally broken. He started rejecting his mother and things that were positive and began smoking marijuana and breaking into houses. He was in and out of training school. He looked for a substitute father figure, which Howard presented. Although his family told him to stay away from Howard, Johnson said he just wanted to be around Howard and looked up to him. Johnson said Howard gave him a gun and drugs to sell.

¶16. Johnson said that Howard talked about robbing a liquor store but changed his mind and robbed the convenience store instead. According to Johnson, Howard went inside the store while he stayed outside, and Johnson only went in when he heard gunshots. Johnson saw the clerk's body on the floor and helped Howard move it. Howard then told Johnson to meet him at an abandoned house, but they got caught. Even in jail, Howard told Johnson not to talk to people and that they had a lawyer. Howard told Johnson not to take an open plea because then the judge could sentence him to anything. When Johnson got another plea offer, he showed it to Howard, and they talked about it. Johnson rejected three plea offers on Howard's advice. However, Johnson said that after Howard talked to other witnesses,

8

they all put the blame on Johnson because he was younger. When Howard took a plea and left him to be tried on his own, Johnson realized Howard had "bamboozled" him.

¶17. Johnson admitted to his bad conduct in prison, saying that he was a troubled child with an attitude problem. Basically, he was trying to live in a corrupted environment. About his last conviction for possession of contraband in a correctional facility, Johnson said he admitted to the guards that he had brought contraband into the prison because he did not want anyone else to take the fall. Since 2015, he has been trying to change. Johnson said he was reliable, would not lie, and was a rehabilitated person. He has renounced gangs and started a reentry program to learn skills like carpentry and gardening. If he could change one thing, it would be to not have been around his half-brother.

¶18. On cross-examination, Johnson agreed that he was not a model prisoner prior to the *Miller* case. Johnson said he was responsible, but "as a person who has been manipulated." He admitted he sold drugs in prison, but he "was just in prison surviving." Johnson said he was in a gang to try to change it from the inside, not to corrupt other members' minds. He had run-ins with the guards because he was "anti-social." Johnson gave his side of the story on two RVRs—one concerning a female guard who had thrown away his breakfast tray, and another where he was charged with assaulting a guard—but he was merely wrestling with the guard over a phone that Johnson was trying to flush down the toilet.

¶19. Johnson's attorney pointed out that Johnson had pled guilty to recent charges even though he knew it would affect his chances at the *Miller* hearing. Johnson's attorney also asked the court to note that there were fifteen to twenty people present in the hearing room,

9

showing the support that Johnson has in the community.

> *C.    Court Ruling*

¶20.    After hearing the State and Johnson's closing arguments, the court ruled on each of the *Miller* factors.  The court weighed the first—Johnson's age at the time of the crime and hallmark characteristics of youth—against Johnson.  The court found that Johnson was sixteen years and eleven months old at the time of the crime, but he had experience with the criminal justice system, having been in and out of training school.  Moreover, the robbery resulting in Johnson's conviction was planned and not a crime of impetuosity.

¶21.    The court also weighed the second *Miller* factor—family and home environment—against Johnson.  Usually, in such cases, the judge said, he would see children who had been subject to abuse or violence inflicted by their parents.  But here, Johnson's mother was "a lovely, God-fearing woman."  Even Johnson admitted that he came from a good home, and the court noted Johnson had community support, as shown by the number of people at the hearing.  The third *Miller* factor the court considered was the circumstances of the crime.  The court noted that Johnson tried to diminish his involvement in the robbery, but there was also proof that Johnson helped plan it, and his fingerprint was on the cash register drawer.  Thus, the court concluded that Howard's influence over Johnson was not the only factor that caused the robbery and eventual homicide.

¶22.    The fourth *Miller* factor was whether Johnson might have been charged and convicted of a lesser offense if not for the incompetencies of youth.  The judge said the crime was not the result of a youthful error and was serious, as shown by the forty-year sentence Howard

received when he pled guilty. The crime that occurred had nothing to do with youthful tendencies. Finally, the court considered the last *Miller* factor, the possibility of rehabilitation. The court weighed this factor "heavily" against Johnson because of Johnson's recent conviction of introducing contraband into the prison. Also, the court noted that Dr. Lott, Johnson's expert, stated in his report that Johnson "remained a risk for oppositional and defiant behavior in the future, given his history before and during prison." The court found that the original sentence was the appropriate sentence and re-sentenced Johnson to life in prison without eligibility for parole.

¶23. Johnson appealed and argues that the circuit court misinterpreted the facts and misapplied the law when it re-sentenced him to life imprisonment without eligibility for parole.

**Standard of Review**

¶24. In *Dampier v. State*, 396 So. 3d 313, 322 (¶32) (Miss. Ct. App. 2022), *aff'd*, 375 So. 3d 1149 (Miss. 2023), we set out the standard of review to be used in cases such as Johnson's, stating:

> "There are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Dotson v. State*, 328 So. 3d 659, 665 (¶23) (Miss. Ct. App. 2021) (quoting *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018)), *cert. denied*, 329 So. 3d 1200 (Miss. 2021). Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id.*

In *Jones v. Mississippi*, 593 U.S. 98, 113 (2021), the United States Supreme Court stated "unequivocally" that a separate factual finding of permanent incorrigibility is not required

before a sentencer imposes a life-without-parole sentence on a murderer under age eighteen. *See also Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016) (holding that *Miller* does not require trial courts to make a finding of fact regarding an offender's incorrigibility); *Wharton*, 298 So. 3d at 926 (¶25) (citing *Chandler v. State*, 242 So. 3d 65, 69 (Miss. 2018)) (holding that a finding of incorrigibility is not required). Moreover, there is no rebuttable presumption in favor of parole eligibility for juvenile homicide offenders. *Chandler*, 242 So. 3d at 69 (¶15). The offender has the burden of proving he is parole-eligible under *Miller*. *Dotson*, 328 So. 3d at 667 (¶29).

**Discussion**

**I.      Whether the circuit court applied the correct legal standard.**

¶25.    In *Jones*, the Supreme Court reiterated that *Miller* allowed life-without-parole sentences for juvenile offenders, "but only so long as the sentence is not mandatory—that is, only so long as the sentencer has discretion to consider the mitigating qualities of youth and impose a lesser punishment." *Jones*, 593 U.S. at 106 (internal quotation marks and citation omitted). "In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id*. at 105.

¶26.    Mississippi's discretionary system now includes a separate sentencing hearing for offenders covered by *Miller* and an examination by the sentencing court of the *Miller* factors. *Parker v. State*, 119 So. 3d 987, 995 (¶19) (Miss. 2013) ("The *Miller* court identified several factors that must be considered by the sentencing authority."); *see also Chandler*, 242 So. 3d

12

at 69 (¶11) (citing *Parker*'s holding). Thus, consideration of the *Miller* factors became the legal standard for sentencing courts sentencing juvenile homicide offenders in Mississippi.

¶27. In its bench ruling at the end of Johnson's *Miller* hearing, the circuit court reviewed each of the *Miller* factors and determined from the evidence presented whether that factor weighed in Johnson's favor (i.e., weighed for or against a life-without-parole sentence) and made its decision. Clearly, the circuit court applied the correct legal standard.

**II. Whether the circuit court abused its discretion in re-sentencing Johnson to life imprisonment without eligibility for parole.**

¶28. Johnson disagrees with the circuit court's analysis of the evidence presented on the *Miller* factors and contends that the circuit court abused its discretion in its findings. However, "[a]buse of discretion is an appellate court's most deferential standard of review." *Longino v. State*, 424 So. 3d 884, 889 (¶17) (Miss. Ct. App. 2025) (quoting *Owens v. State*, 383 So. 3d 305, 309 (¶19) (Miss. 2024)). "The reviewing court should not reverse a discretionary finding by the lower court unless it comes to a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Chamblee v. State*, 426 So. 3d 352, 369 (¶49) (Miss. Ct. App. 2025) (quoting *Tisdale v. S. Cent. Reg'l Med. Ctr.*, 411 So. 3d 227, 231 (¶7) (Miss. Ct. App. 2024)). "[I]n applying the applicable abuse-of-discretion standard of review, this Court may not reweigh the evidence or substitute its judgment for that of the trial court." *Id.*

### A. Age and its Hallmark Features

¶29. The circuit court recognized that Johnson was sixteen years and eleven months old at the time of the convenience store murder. Johnson and his sister testified to his vulnerability

13

after his father died and the influence Howard exerted over him as a substitute role model to be involved in the crime. However, the circuit court noted that Johnson had his own personal experience with crime even before Howard came home from prison. Dr. Lott documented this experience in his report, including a four-month stay at Oakley Training School for burglary of a home when Johnson was thirteen, a six-month stay for bringing a gun to school when he was fourteen, and then another six months when he refused to attend school.

¶30. The circuit court also noted that the convenience store robbery and ultimate shooting was not an impetuous, spur-of-the-moment act by Johnson, but rather, the robbery was planned a week earlier. Dr. Lott's report confirmed that Johnson told him that he and Howard had planned a robbery, albeit of a liquor store at first. Johnson told Lott that when the plan changed from robbing a liquor store to robbing the convenience store, "we had to get a watchout man . . . and we came back." Further, in our opinion in Johnson's direct appeal of his conviction, we noted another witness, Shonda McCoy, who testified that she overheard Johnson, Howard, and an unidentified individual planning the robbery one week before. *Johnson*, 956 So. 2d at 368 (¶22).

¶31. We note that although Dr. Lott cites numerous studies and research findings about the development of the adolescent mind, Lott rendered no opinion on how these findings applied to Johnson. From our review, we find that the record supports the circuit court's finding on this factor, and the court did not abuse its discretion in weighing the factor against Johnson.

       B.    *Family and Home Environment*

14

¶32. In his report, Dr. Lott felt that Johnson was exposed as a child to "criminogenic behavior" in his father's home,[5] which Lott opined had "a major adverse impact on his [Johnson's] future behavior and judgment." However, Dr. Lott did not explain the nature or extent of the "major adverse impact." Offsetting this, the circuit court found that Johnson was raised by a "lovely, God-fearing mother," and he did not suffer any physical or mental abuse as the court had seen in other cases. Johnson admitted he came from a good home, and at the time of the hearing, he had the support of family and friends. In light of the evidence presented, we find that the circuit court did not abuse its discretion in weighing the *Miller* family-and-home-environment factor against Johnson. *See Dampier*, 396 So. 3d at 335 (¶89) (citing *Shoemake v. State*, 323 So. 3d 1093, 1103 (¶35) (Miss. Ct. App. 2019) (finding no abuse of discretion in the trial court's assessment of the home environment *Miller* factor where the court recognized that "by all accounts, [the defendant] comes from a stable and caring family" in comparison to the defendants in *Miller* and *Jackson* who "did not have the benefit of such stability" and ultimately concluded that Shoemake should be sentenced to life without parole)).

### C. Circumstances of the Murder

¶33. The circuit court held that the circumstances of the crime weighed against Johnson because it was the robbery that elevated the crime from a homicide to capital murder, and Johnson was obviously involved in the robbery because his fingerprint was found on the cash

---

[5] Johnson's parents never married, and he was raised by his mother. However, because his father lived in the same town, Johnson saw his father almost daily until his father died in 1992 when Johnson was eight.

15

register tray. The circuit court also noted that there was testimony at the criminal trial that Johnson had participated in planning the crime. Johnson's statements to Dr. Lott in 2025 about the specifics of the crime confirmed this. Further, according to a witness at the criminal trial, Johnson admitted that he had killed the clerk and would do it again. Although Johnson denied saying this at the sentencing hearing, the record nevertheless supports the circuit court's finding that Johnson was a willing participant. There was no evidence of coercion or significant influence by Howard that forced Johnson to be involved. *See Dampier*, 396 So. 3d at 335 (¶90) (holding that the circuit court considered the circumstances of the crime, "including the extent of [Dampier's] participation in the conduct" and any peer pressure that may have affected him). We find that the circuit court's decision to weigh this factor against Johnson was supported by the record and was not an abuse of discretion.

### D. *Incompetencies of Youth*

¶34. On appeal, Johnson does not take issue with the fourth *Miller* factor—whether Johnson might have been charged or convicted of a lesser offense if not for the incompetencies associated with youth. Thus, we find no abuse of discretion in the circuit court's finding that this factor did not weigh in Johnson's favor.

### E. *Possibility of Rehabilitation*

¶35. Johnson argues that the issue is not whether Johnson has already been rehabilitated, but whether "the possibility of rehabilitation" exists. *Miller*, 567 U.S. at 478. We agree and find that in this case, the circuit judge correctly considered the issue as well, specifically saying, "And finally, the *possibility* of rehabilitation." Johnson further argues that his pursuit

of classes and participation in positive programs in recent years "demonstrated a clear trajectory of growth and maturity inconsistent with 'irreparable corruption.'" However, in the court's estimation, this evidence was outweighed by Johnson's recent conviction of contraband smuggling, which occurred while Johnson was waiting for his *Miller* hearing. The court noted that Dr. Lott, Johnson's own expert, stated in his report under the section entitled, "The Prospect for Rehabilitation," that "given his history of oppositional and defiant behavior before and during prison, it is my opinion that he would remain at risk for this type of behavior going forward."

¶36. As noted earlier, we do not reweigh the evidence or determine de novo whether Johnson can possibly be rehabilitated. We must determine whether the circuit court abused its discretion in weighing the factor against Johnson. In light of the evidence presented, we cannot say that the circuit court abused its discretion or erred in its conclusion concerning this factor.

¶37. In sum, we find that the circuit court properly considered all the *Miller* factors and did not abuse its discretion in sentencing Johnson to life imprisonment without parole eligibility.

**Conclusion**

¶38. In Johnson's case, the circuit court conducted a *Miller* hearing and considered the evidence presented on each *Miller* factor. As the Mississippi Supreme Court stated in *Chandler*,

> [a]lthough the trial court had the authority to sentence Chandler to life in prison with the possibility of parole, it chose to sentence Chandler to life in prison, which was also within its authority. Because the trial court satisfied its obligation under *Miller* and *Parker*, and we cannot say the trial court abused

17

its discretion in sentencing Chandler to life in prison, we affirm.

*Chandler*, 242 So. 3d at 70-71 (¶22). Similarly, in this case, the record reflects that the circuit court fulfilled its obligation under *Miller*, and we find no abuse of discretion in the court's re-sentencing Johnson to life in prison without parole eligibility.

¶39. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**